No. 14,720.

HANDLER *v.* GORDON, doing business as GORDON CONSTRUCTION COMPANY.

(140 P. [2d] 622)

Decided July 19, 1943.

Mr. PHILIP HORNBEIN, MR. THEODORE EPSTEIN, for plaintiff in error.

Messrs. VAN CISE, ROBINSON & CHARLTON, Mr. ROBERT A. THEOBALD, for defendant in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the court.

GORDON, defendant in error here, as plaintiff in the district court of the City and County of Denver, obtained a judgment against plaintiff in error, defendant in said district court, in the amount of $52,776.62. The former subsequently instituted supplementary proceedings looking toward the discovery of property which could be applied to the satisfaction of the judgment, in the course of which Handler was examined on different occasions as to what money or property he had. In this supplementary proceeding he was adjudged guilty of contempt of court and sentenced to imprisonment for a period of ninety days. The contempt was originally based upon both perjury and contemptuous conduct upon the witness stand. The charge based upon contemptuous conduct was waived by the court. Handler brought the judgment of contempt by reason of perjury here for review by writ of error, and in *Handler v. Gordon,* 108 Colo. 501, 120 P. (2d) 205, we reversed the judgment conditionally and remanded the case to the district court "without prejudice to the power of the court to proceed further as advised," holding that the court should "recite the facts constituting the contempt." Thereafter the district court made a recital of the facts constituting the contempt, which was the basis of finding the defendant guilty, and the case is now before us for final action.

The findings are comprehended in six divisions, all dealing solely with the testimony of defendant, Handler, and in each division his testimony is set out in full. These findings are in substance as follows: "*1. Perjury about the names and addresses of brothers-in-law.* He stated that he had five brothers-in-law and did not know their names. Then he later stated that he did not know the names of any of them or who they were. Then he stated that his wife had one brother and two sisters living in Denver. Then he was asked what are their names and addresses and answered that directly to the contrary of what he had said in stating that he did not know who they were or the names of any of them [setting out their names and addresses]." *2. Perjury about his mother's drawing checks on the National News Agency account.* His testimony in this matter was a statement by him, first, that it did not make any difference to him whether his mother drew a check or not; finally that to his knowledge he did not know if she did. He later testified that she was never down at the business running it; that his mother was too old a woman to run a retail store, and it depended solely on his judgment as to what should be done in the store. "This was a contradiction of his previous testimony and shows that his mother did not draw checks and he knew she did not draw checks and that she had nothing to do with the business, while he previously stated that he did not know whether she signed checks or not." *3. Perjury about power of attorney.* He first stated he had power of attorney from his mother in the answer, "I have power of attorney from my mother to do whatever I wanted with the account." Then he later testified, "I said I think I had one." "Q. But you haven't got it now? A. No, I haven't got it now." The court's finding accordingly was: "This was, therefore, a statement at one time, 'I have power of attorney,' and at a later time 'I said I think I had one,' being a direct contradiction." *4. Perjury as to Joseph D. Lassa.* After reciting the testimony

of the witness on this phase, the court's finding was: "This was perjury in first evading whether he knew him or not, then describing him, then in not recalling whether he was in business with him, and then absolutely denying that he was in business with him, and then admitting that he was in business with him and fixing the number of days, and that he had a bank account with him." *5. Perjury as to Fred Koehn.* After reciting the testimony of the witness on this matter, the court's finding was: "Hence, he committed perjury in admitting that he had an account at the First National Bank in the name of the National News Agency on which either he or Fred Koehn or others could sign checks, then evading as to whether he knew him or not or as to whether he had dealings with him, as to whether he was in business with him, and then admitting that he knew him and knew him as Freddie." *6. Perjury in regard to the Douglas County property.* After reciting the testimony of the witness on this matter, the court's finding was: "Hence, he committed perjury in not recalling the transaction, then admitting it [land in Douglas County] was purchased from the Grant Building and Investment Company, then identifying the land, that he helped make the deal and bought it for his mother to build a home so she could have a lot of fresh air and sunshine." The court then concluded: "The Court, therefore, finds that in these six instances he committed deliberate perjury. And the judgment of the court is that he is guilty of contempt for perjury in the presence of the court, and that he be sentenced to ninety days in the county jail therefor."

At one point in the proceedings the court warned defendant that he certainly knew more about the records than indicated in the testimony previously given, whereupon he replied "Well, we might as well go to jail. Let's go." He then stepped down from the witness box. When counsel for the plaintiff asked that the witness be declared in contempt, defendant said "All right. Let's go

to jail." Defendant, at the time of the trial, was serving a jail sentence, having been convicted of gambling, which conviction we affirmed in *Handler v. People,* 103 Colo. 378, 86 P. (2d) 1119. The testimony of Handler above referred to was not all given on the same day, but was taken over a period of several weeks. He was taken from the jail to the courtroom each time his testimony was sought. The evidence disclosed that he continued to conduct his business from the jail.

The case of *Eykelboom v. People,* 71 Colo. 318, 206 Pac. 388, is cited by counsel for defendant as controlling. That case began by the filing of a complaint for receivership by the State Bank Commissioner against The Guaranty Securities Company, a corporation of which Eykelboom was an officer. He was also a director and president of the Denver State Bank. Both institutions had the same office in Denver and the commissioner charged that their affairs were wrongfully intermingled, jumbled and confused. A receiver was appointed and in connection with this proceeding a subpoena duces tecum issued ordering Eykelboom to produce a package of letters and correspondence relating to the affairs of the bank. Eykelboom failed to produce the letters as demanded and, while being examined as to the reasons for his failure to so produce, testified in much the same contradictory manner as did the defendant in the instant case. At the conclusion of Eykelboom's testimony, the trial court sentenced him to the county jail for not to exceed six months or until such earlier time as the required documents should be produced in court or until he made a satisfactory and truthful explanation of inability to produce such documents.

In the instant case, in an attempt to locate property of defendant that might be subject to the satisfaction of the above mentioned judgment, defendant was served with a subpoena duces tecum to produce his books in court. He did not produce them, and his justification for his failure to do so was that he had kept no books

or records. It then developed from his testimony that he did business under the name of the "National News Agency," and some of the records kept under that name were brought into court by means of attachment proceedings brought by the court. It will be noted that defendant's relationship to the National News Agency is the subject of one of the statements for which he is alleged to have committed perjury—it appearing that he conducted his own business under that name.

It thus appears that in both cases a subpoena duces tecum issued to produce certain records—in the Eykelboom case the records were never produced; in the instant case some of the records were produced, not through any help of the defendant, but through seizure under order of court.

Counsel for defendant emphasize the point that, in the earlier case, Eykelboom did not produce the documents as ordered, whereas in the instant case Gordon, the judgment creditor, has obtained all of the relief to which he was entitled, namely all of the property of the defendant subject to the execution, that is: defendant's Buick car, stock in the Handler Realty Company (valued at $10.00), and the Douglas County real estate (valued at $990.00). It is true that those items of property have now been transferred to the judgment creditor in partial liquidation of his judgment, but it cannot be said that such recovery was made possible or easy by defendant. On the contrary, it became possible only through the efforts and vigilance of plaintiff and apparently in spite of the efforts and obstruction of the defendant. Counsel for the defendant speak with assurance of plaintiff having recovered everything he was entitled to, whereas all that can be said is that he has recovered those assets of defendant which have been discovered.

Defendant's counsel cite Justice Cardozo's opinion in *Clark v. United States*, 289 U.S. 1 (53 Sup. Ct. 465, 77 L. Ed. 993), and quote therefrom as follows: "The books propound the question whether perjury is contempt, and

answer it with nice distinctions. Perjury by a witness has been thought to be not enough where the obstruction to judicial power is only that inherent in the wrong of testifying falsely. Ex parte Hudgings, supra. For offenses of that order the remedy by indictment is appropriate and adequate. On the other hand, obstruction to judicial power will not lose the quality of contempt though one of its aggravations be the commission of perjury." That proceeding was brought against a juror for obstructing justice and, as indicated, perjury was only an incident in the case; nevertheless, it is true that the federal courts seem to favor the method of information and indictment rather than the summary process.

Mr. Justice Holmes, in *Gompers v. United States,* 233 U.S. 604 (34 Sup. Ct. 693, 58 L. Ed. 1115), at page 612, in discussing contempts arising from failure to observe injunctions, says: "The English courts seem to think it wise, even when there is much seeming reason for the exercise of a summary power, to leave the punishment of this class of contempts to the regular and formal criminal process." Nevertheless in *Patterson v. Colorado, ex rel.,* 205 U.S. 454 (27 Sup. Ct. 556, 51 L. Ed. 879), he stated (page 461): "What constitutes contempt, as well as the time during which it may be committed, is a matter of local law."

In this jurisdiction we have confirmed the use of the summary process in *Eykelboom v. People, supra,* and *Mainland v. People,* 111 Colo. 198, 139 P. (2d) 366; by implication in *Handler v. Gordon, supra.* In the Eykelboom case, supra, we not only affirmed the judgment declaring defendant guilty of contempt for failure to respond to a subpoena duces tecum, but also held that the trial court had a right to punish him for contempt because of manifest perjury committed in its presence, where it knew judicially and beyond doubt that his testimony was false. It was its very falsity that precluded his excuse for failing to produce the documents called

for by the subpoena. Likewise in *People v. Freeman* (1930), 256 Ill. App. 233, it was held that a witness in a criminal case, who, after answering a long line of questions on direct examination, subsequently on cross-examination declared such answers to be false, was guilty of contempt of court, as such testimony showed the utter disregard of the witness for the sanctity of his oath. 73 A.L.R. 820.

Counsel for defendant quote from the case of *Hegelaw v. State,* 24 O. App. 103, 155 N.E. 620, 73 A.L.R. 818, as laying down the rule that in order that perjury may be a contempt of court it must appear that (1) the alleged false answers had an obstructive effect; (2) that there existed judicial knowledge of the falsity of the testimony; and (3) that the question was pertinent to the issue. We believe that the instant case satisfies the requirements therein announced. Certainly the questions were pertinent to the issue of endeavoring to discover property belonging to Handler that was properly subject to the execution issued upon the judgment; second, there was judicial knowledge of the falsity of the testimony in this case, as in the Eykelboom case, merely from the conflicting statements of the defendant himself, without considering any other evidence than that shown by the trial court in its supplemental findings; and third, we believe that the false answers had an obstructive effect.

On the question as to what constitutes obstruction of justice, authorities differ. Reference has already been made to the case of *Clark v. United States, supra;* and the Wisconsin Supreme Court has held that the fact that time was consumed in demonstrating the falsity of the witness's statement was held not to operate as an obstruction of the administration of justice, so as to make such statement punishable as a contempt of court. *State v. Meese* (1930), 200 Wis. 454, 229 N.W. 31, 73 A.L.R. 818. On the other hand, it has been stated that the more prevalent rule is that false swearing by a wit-

ness is held to be such an obstruction of justice as to constitute a direct contempt of court. 13 C.J. 25, §31, and cases thereunder cited. It appears that even in the federal courts the finding by the trial judge that there was an obstruction, was not set aside by the reviewing court. *Schleier v. United States,* 72 F. (2d) 414. In the instant case the original judgment of the trial court read as follows: "The function of the court in punishing for contempt is only to be invoked in cases where, in the opinion of the court, there has been manifest perjury committed. The court can appreciate the mental condition of the defendant and the motives which prompted them and can overlook his insolence to the Court while on the witness stand, *but the defendant in this case in his answers to questions properly presented convinces the Court that he has no appreciation of the significance or sacredness of an oath, and that the manifest perjury committed before the Court should be called an obstruction of justice by the Court,* therefore, I find the defendant guilty of contempt and sentence him to ninety days in jail." (italics ours).

We believe it is a fair statement that had defendant spoken the truth it would not have been necessary to have taken the testimony of other witnesses in this proceeding, including the testimony of three witnesses, i.e. Simon, Isaacson and defendant's mother, Mrs. Ratcher. Nor would defendant himself have had to be recalled as a witness over a period of time. We believe there was just ground for finding that there was an obstruction of justice in this case.

Judgment is accordingly affirmed.

Mr. Chief Justice Young and Mr. Justice Hilliard dissent.

Mr. Chief Justice Young dissenting.

Not because I feel that the conduct of defendant as disclosed by the record in this case entitles him to sym-

pathy, or that any technical construction of the law should absolve him from punishment, but because I do feel that the action permitted by the opinion in this case is in violation of the fundamental individual right of an accused to have found fully and specifically the facts constituting the offence for which he is punished in order that he may have the legality of the judgment penalizing him passed upon by a reviewing court, I dissent from the opinion of the court and feel impelled to state my reasons therefor.

Upon remand to the district court from this court when the cause was formerly before us, *Handler v. Gordon,* 108 Colo. 501, 120 P. (2d) 205, permitting specific findings of fact and a recertification to this court for a second review, the district court made findings of fact, and the matter is now before us on such recertification.

It is pertinent to note that the trial court chose to overlook what it termed "the insolence of the defendant while on the witness stand," and based its judgment of contempt solely on the obstruction of justice by manifest perjury committed before the court. Had the court not seen fit to overlook the insolent conduct of defendant while testifying, and his undisguised actual contempt for the proceeding as shown by his continued evasiveness, feigned misunderstanding of questions, and generally insulting attitude toward court and counsel, there would be support for a judgment that defendant was in contempt of court and that his contemptuous conduct tended to obstruct justice, on findings which the trial court might have made with ample basis in the record. But the matter is not so brought before us and our duty is to determine defendant's culpability and legal liability, not on what he might have been charged with doing and what might have been found if he had been so charged by the trial court, but on what he was charged with doing, and on what was found by the trial court.

He was charged with committing, and was found by the trial court to have committed, manifest perjury in the presence of the court and thereby to have obstructed justice, constituting a direct contempt of court. On this charge and the findings supporting it, and on these alone, the correctness of the trial court's action must be determined on review.

It should be observed that defendant is adjudged to be punished for what is at common law a crime, a direct contempt of court—crime sui generis in that he is not under the common law entitled to trial by jury to determine his guilt. Even Blackstone comments on the anomalous character of proceedings in contempt, for in chapter XX of book 4, pages 280 and 281, he says: "By a *summary* proceeding I mean principally such as is directed by several acts of parliament (for the common law is a stranger to it, unless in the case of contempts) for the conviction of offenders, and the inflicting of certain penalties created by those acts of parliament. In these there is no intervention of a jury, but the party accused is acquitted or condemned by the suffrage of such person only, as the statute has appointed for his judge. An institution designed professedly for the greater ease of the subject, by doing him speedy justice, and by not harassing the free-holders with frequent and troublesome attendances to try every minute offence. But it has of late been so far extended as, if a check be not timely given, to threaten the disuse of our admirable and truly English trial by jury, unless only in capital cases."

It should be observed further that in the present case a fixed and definite penalty was imposed on defendant as a punishment, not a penalty which he might escape by purging himself of contempt by compliance with a court order, as in *Eykelboom v. People,* 71 Colo. 318, 206 Pac. 388. In the latter case defendant was directed to produce certain papers. His defense was that he was unable to comply with the court's order, and in support

of this defense he testified extensively. The trial court in that case was charged with the duty of determining whether contemner had excused himself from such compliance. The trial judge was of the opinion, and so found upon a consideration of his testimony, that he had not done so, and while such findings implied that defendant had committed perjury, the penalty imposed was not a punishment for the perjury as a crime as in the instant case, but for failure without reasonable excuse to comply with the court's order. No such issue is involved in the instant case, the issue here being whether or not the defendant committed the crime of perjury, and for this reason the Eykelboom case is not an authority in point.

Contempts of court being crimes at common law, though not triable to a jury, and so recognized in this jurisdiction by our adoption of the common law (C.L. '21, §6516, '35 C.S.A., c. 159, §1) and having the effect of depriving a defendant of liberty or property, or both, should require as strict compliance with the safeguards necessary to insure due process of law as the common law throws about the trial of criminal cases before a jury.

Section 142, c. 48, '35 C.S.A., defines perjury as follows: "Every person having taken a lawful oath or made affirmation in any judicial proceeding, or in any other matter where by law an oath or affirmation is required, who shall swear or affirm wilfully, corruptly and falsely in a matter material to the issue or point in question, or shall suborn any other person to swear or affirm as aforesaid, shall be deemed guilty of perjury or subornation of perjury, as the case may be, and upon conviction thereof shall be punished by confinement in the penitentiary for a term not less than one year nor more than fourteen years."

In Blackstone Supp., book IV, c. 10, p. 137, Cooley Blackstone, p. 1313, perjury is defined as follows: "The next offence against public justice is when the suit is

past its commencement, and come to trial. And that is, the crime of wilful and corrupt *perjury:* which is defined by Sir Edward Coke, (f) to be a crime committed when a *lawful* oath is administered, in some *judicial* proceeding, to a person who swears *willfully, absolutely,* and *falsely,* in a matter *material* to the issue or point in question."

In *McClelland v. People,* 49 Colo. 538, 113 Pac. 640, 32 L.R.A. (N.S.) 1069, the syllabus correctly states our holding, and is as follows: "To convict of the crime, the people must show that perjury was in fact committed. It must appear not only that the alleged false testimony was given, and that it was false, but also that it was material. It must be shown to have had a legitimate tendency to prove or disprove some fact material to the matter being investigated. The record of the case in which perjury is alleged to have been committed must be produced, and the people must display so much of the testimony given in that hearing as shows clearly the materiality of the testimony alleged to have been falsified."

Blackstone, I assume, sets forth the necessary elements of perjury at common law, and I find them to be no different from those contained in our statute. As it was held in *McClelland v. People, supra,* that to convict upon an information charging subornation of perjury it was necessary to show that perjury was in fact committed, that is, that defendant's conduct contained all the elements of perjury, I submit, that since conviction of perjury either upon information or in contempt proceedings results in loss of liberty or property by defendant, that the findings of the court, when the proceeding is by contempt, must show that perjury was in fact committed, as definitely as must be established in a proceeding by information on a plea of not guilty, followed by a verdict of guilty.

In *Handler v. Gordon, supra,* in response to our pronouncement that the judgment of the trial court "recite

the facts constituting the contempt," if it should be desired to recertify the cause, the court set out certain quotations from defendant's testimony in haec verba. From this testimony the conclusions of the trial court as to the perjury are drawn, and the following are the findings of what the perjury consisted:

"*Now, therefore, nunc pro tunc,* the Court recites the facts constituting the contempt which was the basis of finding the defendant guilty thereof and sentencing him to ninety (90) days in jail, said facts being as follows:

"1. *Perjury about the names and addresses of brothers-in-law.* He stated that he had five brothers-in-law and did not know their names. Then he later stated that he did not know the names of any of them or who they were. Then he stated that his wife had one brother and two sisters living in Denver. Then he was asked what are their names and addresses and answered that directly to the contrary of what he had said in stating that he did not know who they were or the names of any of them.

\* \* \* [Testimony]

"2. *Perjury about his mother's drawing checks on the National News Agency account.* He was asked in regard to his mother's connection with the National News Agency account at the International Trust Company.

\* \* \* [Testimony]

"This testimony was a statement by him first that it didn't make any difference whether his mother drew a check or not, and finally that to his knowledge he did not know if she did.

"Then the following questions and answers were given:

\* \* \* [Testimony]

"This was a contradiction of his previous testimony and shows that his mother did not draw checks and he knew she did not draw checks, and that she had nothing to do with the business, while he previously stated he did not know whether she signed checks or not.

"3. *Perjury about power of attorney.* He first stated he had power of attorney from his mother as follows:

" 'A. *I have power of attorney* from my mother to do whatever I wanted with the account.'

"Then he denied that by saying that he thought he had one.

\* \* \* [Testimony]

"This was, therefore, a statement at one time, 'I have power of attorney,' and at a later time 'I said I think I had one,' being a direct contradiction.

"4. *Perjury as to Joseph D. Lassa.* He was first asked questions as to his knowledge of Lassa, and evaded them.

\* \* \* [Testimony]

"He later was evasive as to his transactions with Lassa.

\* \* \* [Testimony]

"He then, on further questioning described him as follows:

\* \* \* [Testimony]

"Then he denied being in business with Lassa, as follows:

\* \* \* [Testimony]

"Then, later he admitted being in business with Lassa, and that they had a joint account at the First National Bank:

\* \* \* [Testimony]

"This was perjury in first evading whether he knew him or not, then describing him, then in not recalling whether he was in business with him, and then absolutely denying that he was in business with him, and then admitting that he was in business with him and fixing the number of days, and that he had a bank account with him.

"5. *Perjury as to Fred Koehn.* He first claimed that he would have to see Fred Koehn to see if he knew him:

\* \* \* [Testimony]

"Then he couldn't recall whether he had been in business with Mr. Koehn or not:

\* \* \* [Testimony]

"Then he admits he knew Koehn as Freddie:

\* \* \* [Testimony]

"Hence, he committed perjury in admitting that he had an account at the First National Bank in the name of the National News Agency on which either he or Fred Koehn or others could sign checks, then evading as to whether he knew him or not or as to whether he had dealings with him, as to whether he was in business with him, and then admitting that he knew him and knew him as Freddie.

"6. *Perjury in regard to the Douglas County property.* He was asked if he had not had business dealings with the Grant Building and Investment Company in 1937 and in regard to two checks in payment for the property purchased from it, and evaded knowing anything about it:

\* \* \* [Testimony]

"Later, he thought that some real estate was bought from that company for his mother:

\* \* \* [Testimony]

"Then he admitted that he bought it:

\* \* \* [Testimony]

"Then he finally said that he bought that land for his mother to build a home for her in the country. Then he completes the testimony on this point by stating he might have bought it for a filling station, but bought it for his mother so she could have fresh air, but never told her anything about it:

\* \* \* [Testimony]

"Hence, he committed perjury in not recalling the transaction, then admitting it was purchased from the Grant Building and Investment Company, then identifying the land, that he helped make the deal and bought it for his mother to build a home so she could have a lot of fresh air and sunshine.

"The court, therefore, finds that in these six instances he committed deliberate perjury.

"And the judgment of the court is that he is guilty of contempt for perjury in the presence of the court, and that he be sentenced to ninety days in the County Jail therefor."

In its very nature perjury requires: 1. A statement of a matter of fact under oath; 2. that the matter of fact stated be material to the matter judicially in issue; 3. that the matter stated as a fact be false, and 4. that the false statement of the matter of fact be wilfully and corruptly made.

It will be noted that of the four elements mentioned, there is no finding in any of the six alleged cases of perjury that: 1. Defendant made a statement of a matter of fact under oath; 2. that such matter of fact was material to the issue; 3. that the matter of fact stated was false; 4. that the statement of the material matter of fact was wilfully and corruptly made. In other words, there was no compliance with our requirement that the court "recite the facts constituting the contempt," for since the contempt relied upon was perjury our direction in effect was to recite the facts or elements that constitute the perjury alleged to have been committed.

The requirements for an indictment for perjury and a declaration as to what allegations are sufficient, is contained in section 145, chapter 48, '35 C.S.A. This section is as follows: "In every indictment for perjury or subornation of perjury it shall be sufficient to set forth the substance of the offense charged upon the defendant, and before what court or authority the oath or affirmation was taken, averring such court or authority to have had full power to administer the same, together with the proper averment or averments to falsify the matter or matters wherein the perjury is assigned, without setting forth any part of the record or proceedings either in law or equity, other than as aforesaid, and without setting forth the commission or authority of the court, or other authority before whom

the perjury was committed, or the form of the oath or affirmation or the manner of administering the same."

If defendant is to lose his liberty by virtue of the findings of a court that he was guilty of perjury and of what the perjury consisted, certainly those findings should approximate what is necessary to be alleged and proved to sustain a conviction under an indictment or information. One of the prime requisites of the substance of the offense required to be contained in an indictment is a proper averment that a certain matter was stated as a fact and that such statement was false, untrue, and wilfully and corruptly made. In the trial court's findings not a single fact is set forth as stated by defendant to be true which the court finds to be false. The trial court did nothing more than to set forth the statements of fact and say that by other testimony the defendant contradicted them.

Note I, page 1433, chapter XX, Cooley's Blackstone (4th ed.) vol. II, so fully states the reasons for particularity in such findings that I quote the greater part of it. It is as follows: "There were two reasons for holding inferior courts to great strictness in exercising authority to convict of petty offenses in a summary way: 1. That jury trial, which is supposed to be favorable to accused parties was not allowed, and 2. No appeal was given, and therefore the conviction was final. It was perfectly reasonable, therefore, as Pratt, J., says in R. V. Marriott, Stra. 67, to keep the magistrate up strictly to the law. 'No comparison,' says Lord Kenyon, 'can be made between summary proceedings on a conviction before magistrates, and actions in the courts of common law. * * It is necessary for courts of justice to hold a strict hand over summary proceedings before magistrates, and I never will agree to relax any of the rules by which they have been bound. Their jurisdiction is of a limited nature, and they must show that the party was brought within it.' Rex v. Stone, 1 East, 639, 649, 650. See also

Rex v. Corden, Burr. 2279. In People v. Phillips, 1 Park. Cr. R. 95, it is said that a record must be made up in every case as a prerequisite to the execution of the conviction; the reasons of which are: 1. For protection of the accused, that he may not again be convicted of the same offense; 2. For protection of the magistrate: a proper record being conclusive evidence in his favor in cases within his jurisdiction; 3. In the absence of appeal the only mode by which the accused can obtain a review of the sentence is by habeas corpus or certiorari, founded on the record. To the same purport is Bennac v. People, 4 Barb. 164. And the record must recite the facts; not legal conclusions merely, or it will be void. Therefore, a complaint and conviction of defendant for that, on the Lord's day, commonly called Sunday, 'he performed certain worldly employment or business, the same not being a work of necessity or charity, by driving certain horses to which was attached a carriage in which certain persons, not travelers, but residents of the aforesaid county, were carried over the streets of the city of Pittsburgh,' were held bad, because they did not show the purpose for which the carriage was driven. 'No citizen,' says Lowrie, Ch. J., 'could have any sort of protection against the ignorance or wickedness of inferior magistrates, if these were authorized to convict citizens of offenses, and yet allowed so to record their proceedings that the very act done cannot be ascertained, and thus their judgment cannot be tested by their judicial superiors.' Commonwealth v. Nesbit, 34 Penn. St. 398, 403. See Commonwealth v. Burkhart, 23 Penn. St. 521."

It is equally necessary under our law that a similar particularity be observed, for in *Teller v. People,* 7 Colo. 451, 4 Pac. 48, and in *Dockerty v. People,* 96 Colo. 338, 44 P. (2d) 1013, we recognized the fact that contempt of court constituted a crime at common law. In the former case we said: "In our judgment the proceedings in cases of this character partake sufficiently of the

nature of criminal actions to warrant us in holding that they must be reviewed as such."

In the latter case we quoted from *New Orleans v. Steamship Company*, 20 Wall. 387, 392, wherein it was said: "The fine of three hundred dollars imposed upon the mayor is beyond our jurisdiction. Contempt of court is a specific criminal offense. The imposition of the fine was a judgment in a criminal case. That part of the decree is as distinct from the residue as if it were a judgment upon an indictment for perjury committed in a deposition read at the hearing."

For the reason that the trial court failed to comply with our direction to recite the facts constituting the contempt, it is my opinion that the judgment should be reversed.

MR. JUSTICE HILLIARD joins in this dissenting opinion.