38 N.J. Super. 184 (1955)
118 A.2d 430
IN THE MATTER OF CONTEMPT OF COURT BY LORIOT D. BOZORTH.
Superior Court of New Jersey, Chancery Division.
Decided November 23, 1955.
*186 Mr. Mitchell H. Cohen, Camden County Prosecutor.
Mr. Harold W. Bennett, for the defendant.
HANEMAN, J.S.C.
Defendant here is charged with a contempt of court consisting of having written the following letter on the 29th day of September, 1955, to the Gloucester City News, a newspaper circulating in Gloucester City, New Jersey, in which it was printed in an edition appearing on the 29th day of September, 1955:
"Dear Editor:
I see in your columns that Judge Lloyd's ruling in behalf of the Tavern owner's petition makes it mandatory for Council to see that the matter is placed on the ballot for the voters to again determine whether or not such sales shall be permitted between 4:00 P.M. and midnight.
As one who was present at the hearing it is difficult to understand just why the Judge ruled as he did. At the point of recess without the Judge is given to double talk it certainly seemed that he would rule against the Tavern Association. What happened in between that time? Whatever it was it must have influenced the good Judge's decision to pass the buck and make the voters decide the issue.
Why do we pay these men such good salaries if they are not capable of deciding issues when they come before them?
Now the question really is this, not shall the taverns have these extra hours of sale alone, but shall they dominate the good men of our Council, our Mayor, our Legal adviser and Police Department. In other words, who is going to run the affairs of Gloucester City? The constituted authorities or the Tavern Association?
There is only one answer to this question if we desire a decent city. And that is for every self-respecting citizen to go to the poles on election day and vote against this referendum, and `RULE BY THE TAVERN ASSOCIATION.'
 Yours truly
 (s) Rev. Loriot D. Bozorth"
The litigation referred to in the foregoing letter was an action in lieu of prerogative writ entitled Charles R. Bowell, *187 Jr. v. Mayor and Council of the City of Gloucester City and the City Clerk of the City of Gloucester City, Docket L-119-55-PW. The relief therein sought was a demand that a petition requesting a referendum upon the question of the legal hours for the sale of alcoholic beverages be received and filed by the city clerk and that the mayor and council be obliged to cause that public question to be printed upon the ballot for such a referendum to be held on the date of the next general election. On September 9, 1955 counsel for the plaintiff moved for a summary judgment before the Honorable Frank T. Lloyd, Jr., who on that date granted said motion and granted the relief sought in the complaint. Thereafter, the said Judge Lloyd having been apprized of the above letter, directed that the Rev. Loriot D. Bozorth be cited for contempt, and appointed Mitchell H. Cohen to prosecute such action.
It might be well, at the outset, to make some general observations concerning contempts of court.
A succinct statement of the history of contempts and their inclusion in the judicial system of the United States is contained in Bridges v. California, 314 U.S. 252, 285, 62 S.Ct. 190, 204, 86 L.Ed. 192 (1941), from which case more extensive quotation is hereafter made:
"From the earliest days of the English courts, they have encountered obstructions to doing that for which they exist, namely, to administer justice impartially and solely with reference to what comes before them. These interferences were of diverse kinds. But they were all covered by the infelicitous phrase `contempt of court,' and the means for dealing with them is historically known as the power of courts to punish for contempt. As is true of many aspects of our legal institutions, the settled doctrines concerning the mode of procedure for exercising the power of contempt became established on dubious historical authority. Exact legal scholarship has controverted much pertaining to the origin of summary proceedings for contempt. See Sir John Fox, The History of Contempt of Court, passim. But there is no doubt that since the early eighteenth century, the power to punish for contempt for intrusions into the living process of adjudication has been an unquestioned characteristic of English courts and of the courts of this country.
The judicatures of the English-speaking world, including the courts of the United States and of the forty-eight states, have from time to time recognized and exercised the power now challenged. * * *
*188 As in the exercise of all power, it was abused. Some English judges extended their authority for checking interferences with judicial business actually in hand, to `lay by the heel' those responsible for `scandalizing the court,' that is, bringing it into general disrepute. Such foolishness has long since been disavowed in England and has never found lodgment here."
A contempt of court has been defined as a disobedience to the court by acting in opposition to its authority, justice and dignity. Generally speaking, he whose conduct tends to bring the authority and administration of the law into disrepute or disregard, interferes with or prejudices parties during litigation, or otherwise tends to impede, embarrass, or obstruct the court in the discharge of its duties is guilty of contempt. 17 C.J.S., Contempt, sec. 2, p. 4 (1939); 12 Am. Jur., Contempt, sec. 2, p. 389 (1938). Contempts fall into two general categories or classes, i.e., civil contempt and criminal contempt. Although by their very basic nature the two are frequently, at least to some extent, merged in a given act and are sometimes confused, it may be stated that normally, a civil contempt is a contempt consisting in a failure to perform some act required or ordered to be done by a court for the benefit of the opposing party, and is therefore an offense against the party in whose behalf a violated order or judgment is made. The ultimate object of a civil contempt proceeding is the vindication of private rights. A criminal contempt, on the other hand, concerns itself with conduct directed against the authority or dignity of the court. It is an act tending to obstruct, hinder or hamper justice in its due course. The purpose of a criminal contempt is the vindication of public authority and the preservation of the dignity of the court. It involves the element of public injury or offense.
Criminal contempts have been as well subdivided into two general categories, which are commonly referred to as direct or indirect and constructive contempts. The former, as the designation signifies, are contempts committed in the physical presence of the court. State v. Gussman, 34 N.J. Super. 408 (App. Div. 1955). An indirect or constructive *189 contempt is an act committed not in the presence of the court, but at some distance therefrom.
The defendant here stands accused of a criminal indirect or constructive contempt. Wherever the word "contempt" is hereafter used it will be employed to describe such a contempt. That which is hereafter stated has especial and particular reference to an indirect contempt and is limited to such a contempt.
Normally, to constitute the offense of contempt of court for statements made or articles written, the statements or writings must have been made or written at a time when a particular matter was pending in court and prior to the disposition thereof by a judge.
The publication of an article concerning the matter pending before the court, which attacks the character or integrity of the court, jury, parties to the action, attorneys or officers of the court, and which has a tendency to influence or prejudice the tribunal or jury before which such matter is pending, constitutes contumacious conduct. It must tend to intimidate, influence, impede, embarrass or obstruct courts in the administration of justice in a matter pending to be deemed a contempt.
Defamatory comments on the conduct of a judge with respect to particular cases or matters finally disposed of, even though they may be libellous, are not generally deemed contumacious.
The reason underlying such a conclusion must be self-evident upon a slight reflection. Criminal contempt finds its genesis in the theory that the acts complained of constitute a public injury or offense, as distinguished from a private injury or offense.
Both the State and Federal Constitutions contain guarantees of the freedom of speech and press. It is the inherent and basic right of any citizen under our Government to criticize the conduct of his public officials. Basically, the power to punish for the type of contempt with which we are here concerned arises from an insistence that justice will be honestly and fairly administered without fear or favor. The *190 harsh and sometimes unfounded criticism of the members of any of the three branches of our Government may be the unfortunate lot of public officials in any of such branches, but it has always been deemed a basic principle that such comment may be made by the public, subject, of course, to being held accountable for libel or slander. Nor should the judicial branch of our Government enjoy any more enviable condition than the other two branches in this respect. If such permitted comment serves a needful purpose in the executive and legislative branches, there is no sound theory which should deny that a similar purpose is served insofar as the judicial branch of the Government is concerned. Absent any effect upon the honest, fair, impartial and dispassionate administration of justice resulting from criticism of the past acts of a judge in a matter not then pending, to hold such criticism a contempt would amount to a censorship, and this is an untenable and abhorent situation, under our Government. A curtailment of criticism of the conduct of finally concluded litigation cannot be dismissed as insignificant. Such curtailment, to be justified at all, must be in terms of some serious substantive evil which it is designed to avert.
We are here not concerned with acts committed or words spoken or written during the pendency of litigation. There is a paucity of decisions involving an alleged indirect contempt arising from a publication when no matter is pending before the court. The United States Supreme Court has recognized, however, that even where matters are pending before the court, in order to constitute written utterances contemptuous there must be a "clear and present danger to the fair administration of justice," arising from such publications. Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 1038, 90 L.Ed. 1295 (1945); Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1946); Bridges v. California, 314 U.S. 252, 285, 62 S.Ct. 190, 86 L.Ed. 192 (1941).
Logically, the same rule must be applied to such writings published after the determination of a suit when no *191 matter is then pending before the court. It is far more difficult to conclude that there would eventuate a clear and present danger to a fair administration of justice from criticism of the past action of the court, regardless of how harsh or unfair it may be, when no matter to which such criticism was directed, was pending before the judge, than to conclude that such a result would eventuate from similar statements made during the pendency of a suit. It would be a most unusual matter, in which the conduct of a member of the judiciary in connection with a matter that had already been adjudicated or terminated, could be deemed to influence the judgment of the court, to the end that the administration of justice could be perverted or embarrassed. A judge may not hold in contempt one who ventures to publish anything that tends to make him unpopular or to belittle him even where such comment may consist of strong and intemperate language and even where it may constitute unfair criticism. The gist of the power to hold for such contempt is that it must kindle an imminent threat to the administration of justice. Craig v. Hainey, supra.
Even though the statements made when the case is not pending, are libellous, the author is not liable for contempt, absent the above threat to justice, although he may be liable for criminal or civil libel. The power to punish for contempt is not a safeguard for the judges as individuals, but for the functions which they exercise. "Inaccurate and even false comment on litigation no longer pending may not be dealt with by punishing for contempt as a means of assuring the just exercise of the judicial process." Pennekamp v. Florida, supra. Forbidden comment is generally such as may throw psychological weight into the scales which the judge is immediately balancing. Where the scales have already come to rest, the criticism is of that which the judge has seen fit to place on them to cause such balance, and hence has no effect upon the weighing of the elements of justice involved.
In Bridges v. California, supra, the court, both in the majority and dissenting opinion, so well expressed the law concerning contempt and the substantive evil to be averted *192 thereby that it would serve no needful purpose to paraphrase. A somewhat extended series of quotations follows [314 U.S. 252, 62 S.Ct. 197]:
"* * * It appears to be double: disrespect for the judiciary; and disorderly and unfair administration of justice. The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.
The other evil feared, disorderly and unfair administration of justice, is more plausibly associated with restricting publications which touch upon pending litigation. * * *
Judges as persons, or courts as institutions, are entitled to no greater immunity from criticism than other persons or institutions. Just because the holders of judicial office are identified with the interests of justice they may forget their common human frailties and fallibilities. There have sometimes been martinets upon the bench as there have also been pompous wielders of authority who have used the paraphernalia of power in support of what they called their dignity. Therefore judges must be kept mindful of their limitations and of their ultimate public responsibility by a vigorous stream of criticism expressed with candor however blunt. `A man cannot be summarily laid by the heels because his words may make public feeling more unfavorable in case the judge should be asked to act at some later date, any more than he can for exciting public feeling against a judge for what he already has done.' * * * But that the conventional power to punish for contempt is not a censorship in advance but a punishment for past conduct and, as such, like prosecution for a criminal libel, is not offensive either to the First or to the Fourteenth Amendments, has never been doubted throughout this court's history.
* * * `The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government.' Chambers v. Baltimore & O.R. Co., 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 [146]. This has nothing to do with curtailing expression of opinion, be it political, economic, or religious, that may be offensive to orthodox views. It has to do with the power of the state to discharge an indispensable function of civilized society, that of adjudicating controversies between its citizens and between citizens and the state through legal tribunals in accordance with their historic procedures. Courts and judges must take their share of the gains and pains of discussion which is unfettered except by laws of libel, by self-restraint, and by good taste. Winds of doctrine *193 should freely blow for the promotion of good and the correction of evil. Nor should restrictions be permitted that cramp the feeling of freedom in the use of tongue or pen regardless of the temper or the truth of what may be uttered.
Comment however forthright is one thing. Intimidation with respect to specific matters still in judicial suspense, quite another. See Laski, Procedure for Constructive Contempt in England, 41 Harv. L. Rev. 1031, 1034; Goodhart, Newspapers and Contempt in English Law, 48 Harv. L. Rev. 885. A publication intended to teach the judge a lesson, or to vent spleen, or to discredit him, or to influence him in his future conduct, would not justify exercise of the contempt power. Compare Judge Learned Hand in Ex parte Craig, 2 Cir., 282 F. 138, 160, 161. It must refer to a matter under consideration and constitute in effect a threat to its impartial disposition. It must be calculated to create an atmospheric pressure incompatible with rational, impartial adjudication. But to interfere with justice it need not succeed. As with other offenses, the state should be able to proscribe attempts that fail because of the danger that attempts may succeed. The purpose, it will do no harm to repeat, is not to protect the court as a mystical entity or the judges as individuals or as annointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed. The purpose is to protect immediate litigants and the public from the mischievous danger of an unfree or coerced tribunal. The power should be invoked only where the adjudicatory process may be hampered or hindered in its calm, detached, and fearless discharge of its duty on the basis of what has been submitted in court. The belief that decisions are so reached is the source of the confidence on which law ultimately rests.
* * * The limited power to punish for contempt which is here involved wholly rejects any assumption that judges are superior to other officials. They merely exercise a function historically and intrinsically different. From that difference is drawn the power which has behind it the authority and the wisdom of our whole history. * * *
"Comment after the imposition of sentence-criticism, however unrestrained, of its severity or lenience or disparity, cf. Ambard v. Attorney General for Trinidad and Tabago, [1936] A.C. [Eng.] 322 [(1936) 1 All. Eng. R. 704- PC],  is an exercise of the right of free discussion. * * *
"The question concerning the narrow power we recognize always is  was there a real and substantial threat to the impartial decision by a court of a case actively pending before it? The threat must be close and direct; it must be directed towards a particular litigation. The litigation must be immediately pending. When a case is pending is not a technical, lawyer's problem, but is to be determined by the substantial realities of the specific situation. Danger of unbridled exercise of judicial power because of immunity from speech which is coercing is a figment of groundless fears. In addition to the internal censor of conscience, professional standards, the judgment *194 of fellow judges and the bar, the popular judgment exercised in elections, the power of appellate courts, including this court, there is the corrective power of the press and of public comment free to assert itself fully immediately upon completion of judicial conduct." (All emphasis supplied)
Here, the comment made by defendant was by way of a letter written by a member of the clergy, apparently in haste and without that degree of calm deliberation and reflection which might have been present had the author not penned it in the heat of a controversy in which he was vitally interested and engaged. It was made after the determination of the matter by the court and hence there was no matter pending before the judge. That he had no intention to impugn the integrity of the judge concerned, or of our judicial system in this State, I have no doubt. I believe his statement, as an outstanding and highly respected member of the community in which he lives, that he did not intend any such reflection. We are not concerned with whether the statements were made in bad taste or whether they are libellous; we are solely here concerned with whether they were contumacious. The letter was not of such a nature as to occasion a clear and present danger to a fair administration of justice.
I am not unmindful of In re Megill, 114 N.J. Eq. 604 (Ch. 1933), where parties were held guilty of contempt for statements concerning the decision of the court made subsequent to the conclusion of that litigation. Although the court did not there specifically find that there was such a clear and present danger, it should be noted that the comment of which the defendants were accused was of an inflammatory nature and made at a time when as a result of the "Great Depression" courts in other sections of the Nation had been hampered in the fair administration of justice by a total disregard of judicial process in connection with the liquidation of debts. It is conceivable that the nature of the comment, coupled with the time when it was uttered, actually constituted a clear and present danger. The case *195 sub judice is distinguishable and different from the Megill case.
In any event, since courts in criminal contempt proceedings are sitting, to all intents and purposes, on their own function, the power to punish should be used only in flagrant cases and with the utmost forbearance. It is always better to err on the side of tolerance and even with disdainful indifference.
In the light of the foregoing, I find the defendant not guilty of contempt as charged.