No. 18,992.

IN THE MATTER OF JOHN JAMESON.
(340 P. [2d] 423)

Decided April 6, 1959.

Mr. DUKE W. DUNBAR, Attorney General, in support of the citation.

Mr. JOHN JAMESON, pro se.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

THIS is an original proceeding in this court, in which citation was issued to the respondent John Jameson directing him to show cause why he should not be punished for contempt of the Supreme Court of Colorado. Pertinent facts forming the basis for the citation are as follows:

Cause No. 18,871 entitled *The People of the State of Colorado, ex rel. State Board of Equalization and Colorado Tax Commission v. Albert E. Hively, et al.,* was at all times here pertinent a pending action in the Supreme Court of Colorado. The issues involved in said action were of great public importance and it was urgent that an early determination of the issues should be made in order that public officials of the County of Arapahoe might discharge the duties imposed upon them under the law. The issues were highly involved and a draft opinion of the court had been submitted to all participating judges and agreed upon. This opinion consisted of thirty-two typewritten pages and before it could be announced it was necessary to re-copy the entire document

with meticulous care. This court prepared a brief announcement concerning the result reached by the opinion of the court and this brief announcement was made public immediately to the end that officials of Arapahoe county might be governed accordingly. Immediately following the brief announcement, which contained the statement that the opinion of the court would shortly be filed, the respondent John Jameson, who was and is the editor of "The Englewood Herald" which terms itself "Arapahoe County's Largest Newspaper," personally wrote and caused to be published an editorial which contained inter alia the following:

"A Colorado Supreme Court ruling Thursday in the Arapahoe county valuation case deserves a close looking at and some questions on behalf of the taxpayers of Arapahoe County.

\*    \*    \*

"In view of these circumstances enumerated, it seems to me that a number of questions develop in the minds of the taxpayers concerning the Colorado Supreme Court decision.

"One of these is: 'Is the supreme court still hunting for justification of its ruling and that is the reason that an opinion explaining the ruling was not filed with the ruling?'

"Could this be something like a judge who might say to a man: 'You're guilty. Come back next week and by then I'll have the reasons why.'

"Or could this ruling — without an opinion — been a sort of a feeler, or a trial balloon as the politicians say — to find out how the public might feel?

"Could it have been that if the populace should rise up in wrath that the opinion could temper down the ruling, or, if it went almost unnoticed, the court could breathe easier and file an opinion backing up its ruling to the hilt?

"Or could it be that the justices — they are elected state-wide, too — felt that the problem of getting po-

litically powerful school teachers paid on time justifies the means used of issuing a quick ruling without legal opinion in its support?

"I don't know the answers, but I do know that unless the opinion within a week or so softens the broad terms of the sketchy ruling the court has chiseled away more of our vanishing local governmental rights."

The foregoing article was published prior to the typing and filing of the previously approved opinion of the court, and prior to the time within which a petition for rehearing might be filed.

Pursuant to the citation, respondent John Jameson made answer in writing as follows:

"March 14, 1959

"The Supreme Court of The State of Colorado, State House,

"Honorable Justices:

"This is my answer to your citation of March 5, 1959.

"You stated that the editorial was published *'apparently'* with the intent of 'degrading this Court' and 'insulting and embarrassing this Court and the Judges.'

"I assure you that there was no desire or intent, apparent or otherwise, to embarrass or insult the Court or its members.

"It was not my intent, and I do not believe that I did, to make any 'false, defamatory and libelous' statement concerning the Court.

"Just as you have a sacred trust in interpreting the laws, I, as a newspaper publisher, have a sacred trust to keep my readers, who are the people and taxpayers of Arapahoe county, informed on governmental affairs and make comment on the workings of the people's government, including the Courts.

"The Bill of Rights of the United States Constitution guarantees to the people of the United States and to a newspaper publisher the right to make comment.

"In this case the taxpayers of Arapahoe county stood to lose approximately $100,000 in state school aid pro-

vided by taxes and, in fact, they have lost that sum by action taken by the state treasurer under the Court's order before that order became final.

"I believe, and ask you to agree, that I was within my rights under the guarantees of the Bill of Rights to make the comment I did on the case.

"If I am not permitted to comment as I did on such matters then the constitutional right of freedom of the press is destroyed.

"Believe me, I am distressed that the highest Court in our state would entertain a thought that I, a law-abiding and responsible newspaperman for 30 years, am disrespectful of the Court, which I am not.

"I ask the Court to agree with me and find that I have done nothing that is in contempt.

"Respectfully,
(Sgd.) John Jameson"

On March 18, 1959, a hearing was conducted before the court at which the Attorney General appeared in support of the citation and respondent appeared in his own behalf. In open court respondent waived his right to be represented by counsel and was informed by the acting Chief Justice that he had a right, if he elected to do so, to stand upon his answer and to decline to answer any questions which members of the court might otherwise desire to ask him. He indicated a willingness to respond and various members of the court propounded questions directed to the alleged contemptuous article, all of which appears in the transcript of said proceedings.

Among the questions directed to the respondent by various members of the court, and answers made thereto, were the following:

"Q. Mr. Jameson, what inference do you think the public drew from your first comment here that we have in the citation? What inference do you think the public would draw from what was suggested as your first question here in your editorial: 'Is the Supreme Court still

hunting for justification of its ruling and that is the reason that an opinion explaining the ruling was not filed with the ruling? What inference do you think the public would draw from that? A. I would rather not answer that, if the Court please.

\* \* \*

"Q. So you were not aware that when a decision or decisions are announced by this Court, that many weeks prior thereto opinions are circulated, copies to each Judge, and opinions are studied and discussed and otherwise talked over before an opinion is announced, and that is before a decision is made, a written opinion? Did you make any effort to find that out? A. No, sir, I did not.

\* \* \*

"Q. In your answer, Mr. Jameson, you say that as we, the Court, have a sacred trust in interpreting the laws, that you, as a newspaper publisher have a sacred trust to keep your readers who are the people and taxpayers of Arapahoe County informed on governmental affairs and make comment on the workings of the people's government, including the courts. Do you sincerely tell us now that this article and the questions which you asked were designed to inform the people of Arapahoe County about any fact? A. In my mind it was. Q. What fact? A. Of the situation. Q. Mr. Jameson, this Court is made up of men, none of whom have practiced law less than twenty years. Did you know that every man on this Court had a copy of a written opinion 32 pages in length for a week at least before this announcement was made? A. No, sir, I did not. Q. You would indicate to the contrary in your newspaper article, wouldn't you? A. Yes, sir. Q. You made no inquiry as to what the truth was before you informed the people in the manner in which you did? Do you sincerely tell us that you think you did the right thing by this Court in publishing this kind of an article, an inflammatory article, without knowing anything about what the facts were? A. If you please, I

stand on my answer, that in my own mind, I was within my rights to make the comments that I did in the newspaper.

       \*   \*   \*

"Q. Was there any purpose of mentioning the fact that we were elected state-wide, any purpose in that, or any purpose in talking about the politically powerful school teachers other than to create an impression that we were yielding or might yield to political pressure? A. If the Court please, I say again I think that was fair comment."

       \*   \*   \*

"Q. May I read one question from your article: 'Could it have been that if the populace should rise up in wrath that the opinion could temper down the ruling, or, if it went almost unnoticed, the court could breathe easier and file an opinion backing up its ruling to the hilt?' What kind of an attitude and frame of mind do you think the readers of that article would have of a Supreme Court? Do you think that was a fair thing for you to do, knowing no more than you confess you knew about the situation at the time you printed it? A. Yes, sir, I think it was."

       \*   \*   \*

"Q. You don't think we are being attacked when you inferentially indicate that we are listening to the way the winds blow before we issue an opinion, that we are dominated by what the public clamor may want? You don't think that is impugnment or an attack upon the Court? A. No, sir, I think it's fair comment."

       \*   \*   \*

"Q. I want to ask one final question. Now, in light of all we have told you about how we operate here and in the light of all the developments that have been presented to you here, you still think that your editorial was factual and the content fair comment? A. That sort of, if you please, is an all-inclusive question. Q. We will break it up. After hearing what we told you here about

how we operate, do you still think that your editorial was in fact factual? A. I will say that at the time I wrote it, it was factual. Q. I am asking you, and you have heard what I said — A. You have now told me that the opinion was already prepared, and of course, I will take your word for that. Q. It would happen to be the truth. Secondly, now that we have this statement from you about the factuality of the situation, do you think it was fair comment in view of what you now know? A. Yes, sir, I still do. I think it was fair comment, if you please."

Without the slightest investigation of the facts, and in total disregard of the truth; with utter lack of consideration for the reputation of the court and the individual judges thereof, respondent by his defamatory article, in legal effect, accused this court and every judge thereof of conduct abhorrent to every esteemed tradition of the judiciary of the state and of the nation. With a reckless abandon he sought to engender a public atmosphere of hostility to the court; to create in the mind of the public by false assertions, innuendos and suggestions, the impression that the court is swayed this way or that by political consideration and is unworthy of the confidence and respect of the people. While his answer to the citation professed a "sacred trust" to keep his readers informed, he actually betrayed that trust by giving them only untruths — a diet overburdened with the calories of misinformation.

At the hearing during which it was made clear that all of the accusations were without foundation in fact, the affront to the court was compounded by respondent who persisted in his contumacious attitude, evidencing a calloused lack of any desire to mitigate the injury to the name and reputation of the court and the judges thereof, by acknowledging any shortcoming on his part. Although the conduct of respondent at the hearing was such as might warrant a finding of contempt committed in the immediate presence of the court, and punishable summarily, we have chosen to confine our judgment to

the matter as originally instituted, namely, as an alleged constructive criminal contempt.

Addressing ourselves to the legal questions involved we consider the First and Fourteenth Amendments to the Constitution of the United States and Article II, Section 10, of the Constitution of Colorado. The provision in the first above-mentioned contains the following: "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *." The Supreme Court of the United States in *Bridges v. California*, 314 U. S. 252, 62 Sup. Ct. 190, held that the Fourteenth Amendment makes applicable to the states the same standards of freedom of expression as under the First Amendment are applicable to the Federal Government. The applicable provision of the Colorado Constitution, in pertinent part, reads as follows:

"No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty * * *."

Questions to be Determined.

First: *Within the constitutional provisions above mentioned, under what circumstances can the publisher of a newspaper be punished for contempt of court for publishing an editorial containing matter which is false and defamatory concerning the court or judges thereof acting in an official capacity with reference to pending litigation?*

Under early decisions of this court and elsewhere in the nation, very broad powers were exercised by the courts in this connection. A comprehensive review of these broad powers and the application thereof to specific incidents will be found in *People v. News-Times Publishing Company*, 35 Colo. 253, 84 Pac. 912. In that case the publisher of defamatory matter, though more offensive than that in the instant case, was punished for contempt. The conviction was upheld by the Supreme Court of the United States in an opinion written by Mr.

Justice Holmes, *Patterson v. Colorado*, 205 U.S. 454. More recent decisions have in very large measure nullified the holding in the Patterson case. We glean from the authorities that at this time the law applicable to constructive criminal contempt matters is settled as follows:

■ (1) When a case is finished, courts and judges are subject to the same criticisms as other people and no comment published in connection with a completed case, however libelous or unjust, is punishable as a contempt of court. The remedies of the judge who suffers abuse at the hands of the press are the same as those available to persons outside the judiciary. *Pennekamp v. Florida,* 328 U.S. 331, 66 S. Ct. 1029; *In Re Bozorth,* 38 N.J. Super. 184, 118 Atl. (2d) 430.

■ (2) With reference to pending actions the court has inherent power and a corresponding duty to punish for contempt those who publish newspaper accounts concerning causes pending, the inherent tendency of which is to influence, intimidate, impede, embarrass or obstruct courts in the administration of justice.

■ (3) The inherent tendency of the publication to thus obstruct justice must amount to a clear and present danger that the evil result intended may be accomplished. The danger must be serious and substantial. What finally emerges from the "clear and present danger" cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished as a constructive contempt. Thus editorial comment on pending cases, even if it is grossly unfair and false, is not to be adjudged contemptuous unless it constitutes an "imminent peril" to the administration of justice. *Craig v. Harney,* 331 U.S. 367, 67 S. Ct. 1249; *People v. Goss,* 10 Ill. 2d 533, 141 N.E. 385; *Pennekamp v. Florida,* supra. See also American Bar Association Journal, Vol. 41, Number 10, page 897, and Dicta, Vol. 18, page 169. The power to punish for constructive

criminal contempt finds its genesis in the theory that the acts complained of constitute a public injury or offense, as distinguished from a private injury or offense.

Second: *Within the contemplation of the above-mentioned principles, did the defamatory publication authored by the respondent constitute an "imminent peril" to the administration of justice?*

■ This question is answered in the negative. It would be absurd for us to say that publication by respondent of the editorial in question amounted to a real and substantial threat to the impartial decision by this court of the issues involved in the case then pending before us. No member of this court could possibly have been influenced in the least degree in the determination of the issues then before it by the unfounded attack of the respondent upon the integrity of the court. While we agree with the assertion of Mr. Justice Frankfurter in his dissenting opinion in *Bridges v. California,* supra, that in a proper case the court should, " * * * continue to use time-honored safeguards to assure unbullied adjudications," we are certain that no such result could . possibly have been produced by the conduct of respondent. From that opinion we take the following quotation and adopt it as a safe and sound rule. Speaking of the exercise of the power to punish for contempt, Mr. Justice Frankfurter said:

"The purpose, it will do no harm to repeat, is not to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed. The purpose is to protect immediate litigants and the public from the mischievous danger of an unfree or coerced tribunal. The power should be invoked only where the adjudicatory process may be hampered or hindered in its calm, detached, and fearless discharge of its duty on the basis of what has been submitted in court."

The belief by the public that decisions are reached in

that manner is the source of the confidence on which law and the stability of our system rests. The person who seeks to destroy that confidence by publication of false statements does not necessarily subject himself to punishment for a contempt of court. By holding in the instant case that Jameson cannot be punished for contempt of court we do not infer that his conduct was justified under the law. It might well be made the subject of other litigation in which compensatory and punitive damages might be sought in a civil suit for libel or punishment for a violation of the statute defining the offense of criminal libel.

We think the history of the judiciary will support the assertion that judges are not readily susceptible to intimidation. As stated by Mr. Justice Douglas in *Craig v. Harney,* supra, "Judges are supposed to be men of fortitude, able to thrive in a hardy climate." We are confident that the responsible leadership of the press in this state is interested in the purity and dignity of the courts, and would not tolerate or uphold the irresponsibility exhibited by the conduct of respondent in this case. We are confident that the press, generally, as the champion of the people's rights, is interested in preserving the respect due the courts of justice as evidenced by a minimum of incidents such as that now being considered.

In matters of this kind the court, of necessity, sits in judgment on its own motives and function in exercising the power to punish for contempt. However great the provocation we should proceed with forbearance and restraint lest we confuse the indignant reaction which all men experience from an unfounded attack upon their honesty and integrity, with the "imminent peril to the administration of justice" which must be present to warrant punishment for contempt.

The rule to show cause is discharged and the respondent is held to be not guilty of constructive criminal contempt.

MR. JUSTICE DAY specially concurs.

MR. CHIEF JUSTICE KNAUSS and MR. JUSTICE HALL dissent.

MR. JUSTICE SUTTON not participating.

MR. JUSTICE DAY specially concurring.

I concur in the majority opinion, but believe it apropos to point out that just as there are rules and legal precedents in the law which the courts must follow, and which we conscientiously endeavor to do in this case, so also there are precedents in the history of the American press to establish that truth is the very foundation upon which the conception of a free press was built. Emblazoned on the facade of the Dallas Morning News is the epitome of the strict code of a free press: "Build the news upon the rock of truth and righteousness. Conduct it always upon the lines of fairness and integrity. Acknowledge the right of the people to get from the newspaper both sides of every important question."

The press has a tremendous responsibility in maintaining its own freedom. It is honor bound to shun all distortion and falsification that might poison public opinion. Mistakes are permissible. Deliberate distortion is criminal. Free men are deeply grateful for the segment of the press that adheres to a high standard of honor. The press must not submit to either internal or external compulsion. It must not parade half-truth for the whole. It is not free to falsify.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

I do not agree with the over-all holding of the majority that Jameson, under the facts before us, is, under Federal and State Constitutions, immune from punishment by this court for his actions. Were I of the opinion that constitutional provisions protect him from pun-

ishment for contempt and divest this court of power to punish, then I would not censure him or to any degree be critical of his conduct in seeking refuge under the protective coverage of the constitutions. If the constitution does afford to Mr. Jameson what I consider unwarranted protection from punishment for wrongful acts, then my criticism would be directed at the constitution, rather than against the citizen who, under our government of laws rather than men, avails himself of the protection afforded.

The majority opinion sets forth in full the words published by Mr. Jameson which prompted the court to cite him for contempt. I feel that the background leading up to the publication of the offensive editorial is desirable and necessary to a complete understanding of the problem now before the court.

In the summer and fall of 1958, the assessor of Arapahoe County assessed property in his county in a total amount that did not meet with the approval of the State Board of Equalization or the Colorado Tax Commission. On September 29, 1958, an action was commenced in the District Court of Arapahoe County, wherein Arapahoe County officials sought relief against the Board of Equalization and the Tax Commission. The Board and the Commission appeared in the district court and contended that the court was without jurisdiction in the matter, which contention was denied, the court indicating its intention to proceed with the matter. The Board and the Commission, still feeling that the court was without jurisdiction, on October 30, 1958, filed their petition in this court as an original proceeding, seeking: (1) an order in mandamus directing the Arapahoe County assessor to correct his assessment roll in manner necessary to carry out the directions of the State Board of Equalization, and (b) an order prohibiting the district court from proceeding further in the matter. The Arapahoe County assessor and the district court filed with this court a thirty-three page answer

to the petition, and thus the contest between the State and Arapahoe County was transferred from the Arapahoe County District Court to the Supreme Court of the State of Colorado.

Both the State and the County were represented by able counsel, voluminous briefs were filed, oral arguments were had on January 26, 1959, and thereupon the matter was submitted to the court for its consideration and determination.

On February 26, 1959, this court announced that it had determined the issues in favor of the State and against the County, and that a formal written opinion would follow.

On March 2, 1959, Jameson published the editorial which is the basis of this proceeding in contempt. On March 4, 1959, a thirty-two page written opinion, setting forth the views of this court and disposing of the points urged by all counsel in the case, was lodged with the clerk and made available to the parties and the public. On March 6, 1959, this court, on its own motion, caused to be issued a citation directing Mr. Jameson to appear before the court and show cause why he should not be punished for contempt by reason of the publication on March 2, 1959, of the editorial involved.

On March 16, 1959, Mr. Jameson filed with this court his answer to the citation, which answer is set forth in full in the majority opinion. On March 18, 1959, Mr. Jameson, pursuant to an order of this court, appeared before the court and was given an opportunity to present any matter that he might choose to present in his defense. He offered nothing in defense, contending that his editorial was "fair comment," was justified, and did not constitute contempt of the court. At the close of this hearing the court took the matter under advisement.

On March 19, 1959, the Arapahoe County assessor and the district court, through their counsel, filed a "Petition for Rehearing," seeking to have this court vacate

its formal opinion and judgment entered in the proceedings, wherein the rights and duties of the state and Arapahoe County were adjudicated. In this petition counsel for the county, in an orderly, respectful and lawyer-like manner, presented to this court reasons why they felt the conclusion of this court was wrong and why a rehearing should be granted. This petition was on March 30, 1959, denied, whereupon the judgment of this court, announced February 26, 1959, became final.

With this background in mind, I turn to the offense of Mr. Jameson.

First, it is essential to determine whether Mr. Jameson's editorial was published during the pendency of the proceedings between the state and Arapahoe County. Mr. Jameson's editorial was published on March 2, 1959, and final disposition of the case was made March 30, 1959. Mr. Jameson, in response to a question by a member of the court, stated that at the time he published his editorial he knew that the case was still pending.

"Yes, Mr. Justice, I knew that. I commented on that in my answer."

Clearly, the editorial was published concerning a case then pending in this court and awaiting the further proceedings provided by law prior to final determination, all of which was well known to Mr. Jameson on March 2, 1959, when he published his editorial.

The general rule of law governing in such situations is:

"In general any publication relating to judicial action and tending to intimidate, influence, impede, embarrass, or obstruct courts in administering justice in matters pending before them constitutes contempt, irrespective of its truth or falsity, or of the intent with which it is accompanied.

"In determining whether a particular publication constitutes contempt of court, regard must be had to the surrounding facts and circumstances. As a general rule any publication tending to intimidate, influence, im-

pede, embarrass, or obstruct courts in the due administration of justice in matters pending before them constitutes contempt. The rule applies to any publication which has a tendency to prejudice or prevent fair and impartial action in a cause under judicial investigation, whether by threats or other forms of intimidation, or by reflections on the court, counsel, parties, or witnesses, respecting the cause. To constitute contempt the publications need not be made in the place where the court is held; circulation in and about such place is sufficient. Neither is it necessary to show that they actually obstructed, impeded, or embarrassed the administration of justice, although it must appear that their tendency was of that character. As a general rule the publication may constitute contempt whether it is true or false, especially where the facts published would not be admissible in evidence; but in some cases truthful publications relating to judicial proceedings have been held not to constitute contempt. * * *." 17 C.J.S. 41, 42, Contempt, §30 (a).

Such was the rule at common law as it existed in England long before Colorado became a Territory or a State, which, by statute (now C.R.S. '53, 135-1-1), was adopted as the rule of decision in Colorado so far as the same is applicable.

This court has, in an unbroken line of decisions, followed the above quoted general rule.

In *Hughes v. The People,* 5 Colo. 436, this court, in sustaining a judgment of a County Court holding the respondent guilty of contempt, said:

"In *Charlton's Case,* 2 Mylne & Craig, 316, it is said by the Lord Chancellor, 'Every writing, letter or publication which has for its object to divert the course of justice, is a contempt of the court. * * * Every insult offered to a judge in the exercise of the duties of his office is a contempt.'

"In the celebrated case of *Commonwealth v. Dandridge,* 2 Va. Cases, 408, it is said, upon the authority of

Blackstone and other sources of the common law, that 'Every court of record has a right to punish contempts offered to it, by fine and imprisonment. This power is given to the courts, not for the private advantage of the judges who sit in them, but to preserve to them that regard and respect which, without such authority, is entirely lost among the people, and for this reason the power results from the first principle of judicial establishment, and must be an inseparable attendant upon every such tribunal. * * * These contempts may be committed by speaking or writing contemptuously of the court or judges acting in their judicial capacity, or by saying or writing anything which is calculated to prejudice the public mind respecting any suit pending in court, or tending to scandalize the judge respecting his judicial acts or character."

In *Cooper v. People,* 13 Colo. 337, 22 Pac. 790, in sustaining a judgment of a district court finding respondent guilty of contempt, this court said:

"There can be no doubt that the tendency of the articles and cartoon exhibited in this affidavit, responsibility for which plaintiffs in error admit by their answer, was to prejudice the public as to the merits of a cause then pending and undisposed of; to degrade the court and judge before whom the same was pending; and to impede, embarrass and defeat the administration of justice in reference thereto.

* * *

"Parties have a constitutional right to have their causes tried fairly in court, by an impartial tribunal, uninfluenced by newspaper dictation or popular clamor. What would become of this right if the press may use language in reference to a pending cause calculated to intimidate or unduly influence and control judicial action? * * *.

"We would not for a moment sanction any contraction of the freedom of the press. Universal experience has shown that such freedom is necessary to the perpetua-

tion of our system of government in its integrity; but this freedom does not license unrestrained scandal. By a subsequent clause of the same sentence of our state constitution in which the liberty is guarantied, the responsibility for its use is fixed. With us the judiciary is elective, and every citizen may fully and freely discuss the fitness or unfitness of all candidates for the positions to which they aspire; criticise freely all decisions rendered, and by legitimate argument establish their soundness or unsoundness; comment on the fidelity or infidelity with which judicial officers discharge their duties, — but the right to attempt, by wanton defamation, to prejudice the rights of litigants in a pending cause, degrade the tribunal, and impede, embarrass or corrupt that due administration of justice which is so essential to good government, cannot be sanctioned. 2 Bish. Crim. Law (7th ed.), §259."

In *People v. Stapleton,* 18 Colo. 568, 33 Pac. 167, this court, in an original proceeding, as is the case at bar, found respondents guilty of contempt. Among other things the court said:

"With all due respect for the profession of journalism, and with no desire to restrict or interfere with its sphere of usefulness, we must declare that the courts possess advantages superior to the journalist in the matter of hearing, trying, and determining causes affecting public and private rights. The law as administered by the courts gives each party an opportunity to present his cause by pleading and proof, each party having had previous notice of what the other claims. The court decides only after each party has had opportunity to be heard.

"The enterprising journalist acts promptly in gathering news; his information is frequently *ex parte;* and his comments and conclusions thereon are hurriedly announced. The demands of the public require this course of action at the hands of the journalist. But it is not demanded that he shall assume the duties of the judiciary. Imperfect as may be the conclusions of the court in some

cases, it would be a great mistake to substitute in their place the local comments, or even the editorial opinions, of the press. The injuries to public and private rights occasioned by the present methods of administering justice are as nothing to what would result, if causes were determined without fair opportunity for hearing and trial; as was said by the wise man of old: 'He that answereth a matter before he heareth it, it is folly and shame unto him.' "

In *People v. News-Times Pub. Co. and Patterson,* 35 Colo. 253, 84 Pac. 912, this court, in an original proceeding (as here), found Patterson guilty of contempt and imposed as punishment a fine of $1000.00. In that case, as in this case, the respondent was charged with publishing libelous matters concerning the Supreme Court, it being alleged:

"That said articles and cartoon were further intended to impede and corrupt the due administration of justice with reference to said causes in this court, and to impute to this court and certain of the justices thereof, unworthy motives and dishonorable conduct, tending to bring said court and its justices into disrepute and to destroy the respect of the public for this court, for its decisions, its honesty, integrity and its dignity."

In the above case, as in this case, matters were still pending and undetermined, and respondent there, as here, claimed the Bill of Rights, the State and the United States Constitutions guaranteed to him the right to publish the alleged offensive material and *during the pendency* of the matter. This court rejected that contention and on appeal to the United States Supreme Court that court also rejected Mr. Patterson's contentions and dismissed the writ of error. *Patterson v. Colorado,* 205 U.S. 454 (1907). Justice Holmes delivered the opinion of the court and, among other things, said:

" * * * The contempt alleged was the publication of certain articles and a cartoon, which, it was charged, reflected upon the motives and conduct of the Supreme

Court of Colorado in *cases still pending* and were intended to embarrass the court in the impartial administration of justice. * * *.

\* \* \*

"It is argued that the articles did not constitute a contempt. In view of the answer, which sets out more plainly and in fuller detail what the articles insinuate and suggest, and in view of the position of the plaintiff in error that he was performing a public duty, the argument for a favorable interpretation of the printed words loses some of its force. However, it is enough for us to say that *they are far from showing that innocent conduct has been laid hold of as an arbitrary pretense for an arbitrary punishment.* Supposing that such a case would give the plaintiff in error a standing here, anything short of that is for the state court to decide. What constitutes contempt, as well as the time during which it may be committed, is a matter of local law.

\* \* \*

" * * * The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

"What is true with reference to a jury is true also with reference to a court. Cases like the present are more likely to arise, no doubt, when there is a jury and the publication may affect their judgment. Judges generally, perhaps, are less apprehensive that publications impugning their own reasoning or motives will interfere with their administration of the law. But if a court regards, as it may, a publication concerning a *matter of law pending before it,* as tending toward such an interference, it may punish it as in the instant put. When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by pre-

mature statement, argument or intimidation hardly can be denied. * * *.

" * * * We have scrutinized the case, but cannot say that it shows an infraction of rights under the Constitution of the United States, or discloses more than the formal appeal to that instrument in the answer to found the jurisdiction of this court." (Emphasis supplied.)

In my humble opinion, the issues in this case (admittedly Patterson's actions were much more extensive and offensive than Jameson's) are identical with the issues in the Patterson case, and the decision in that case is controlling in the present proceedings.

The Supreme Court of Colorado has without deviation followed the ruling in the Patterson case, has with approval cited it as authority, and quoted from it: *Coolidge v. People,* 72 Colo. 35, 209 Pac. 504; *Fort v. Farmers Exchange,* 81 Colo. 431, 256 Pac. 319; *People v. Dist. Court,* 89 Colo. 78, 299 Pac. 1.

See, also, *Handler v. Gordon,* 111 Colo. 234, 140 P. (2d) 622, wherein it is said:

" * * * Nevertheless in *Patterson v. Colorado, ex rel.,* 205 U.S. 454 (27 Sup. Ct. 556, 51 L. Ed. 879), he stated (page 461): 'What constitutes contempt, as well as the time during which it may be committed, is a matter of local law.' "

Clearly, the above cases furnish precedent for the punishment of Mr. Jameson for contempt.

I am not unmindful of recent decisions of the United States Supreme Court, which some contend weaken, cast doubt upon or oven overrule the pronouncement of the United States Supreme Court in *Patterson v. Colo.,* supra.

In *Toledo Newspaper Co. v. United States,* 247 U.S. 402 (1918), the United States Supreme Court held the respondent guilty of contempt for publishing an article with reference to pending litigation. The court, through Chief Justice White, said:

" * * * True, it is urged that, although the matters

which were made the basis of the findings were published at the place where the proceedings were pending and under the circumstances which we have stated in a daily paper having large circulation, as it was not shown that they had been seen by the presiding judge or had been circulated in the court room, they did and could form no basis for an inference of guilt. But the situation is controlled by the reasonable tendencies of the acts done and not by extreme and substantially impossible assumptions on the subject. * * *."

The rule announced in the *Toledo* case has since been referred to as the "reasonable tendency rule."

In *Nye v. United States,* 313 U. S. 33 (1941), the court reviewed a judgment of the United States Circuit Court of Appeals, which had affirmed a judgment of a United States District Court finding Nye guilty of contempt for writing certain letters and filing a final account. Nye was charged with violation of §268, Jud. Code, Act of March 3, 1911, c. 231, 36 Stat. 1163, which reads as follows:

"The said courts shall have power to * * * punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: Provided, That such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person *in their presence, or so near thereto as to obstruct the administration of justice,* * * *." (Emphasis supplied.)

The only question involved in the case and resolved by the court was the meaning of the words, "in their presence" and "so near thereto." The majority of the court held that the acts complained of, though highly reprehensible and of the kind "which corrupts the judicial process and impedes the administration of justice," were not done in "the presence" of the court or "near thereto"; therefore Nye should be and was discharged. The majority expressly overruled *Toledo Newspaper Co. v. United States,* supra. Chief Justice Charles Evans Hughes, Justice Stone and Justice Roberts dissented.

In *Bridges v. California,* 314 U.S. 252 (1941), the Supreme Court of the United States was called upon to review two judgments of the Supreme Court of the State of California, which judgments had affirmed judgments of the Superior Court of Los Angeles finding *Bridges* in one case and the *Times-Mirror* in the other case guilty of contempt, in that they had published certain articles concerning cases then pending before the Superior Court, which articles the Superior Court and the Supreme Court of California held to be contempt of court and punishable as such.

The United State Supreme Court, by a five to four decision in an opinion authored by Mr. Justice Black, held that the conduct complained of did not constitute contempt, and in so holding found that the alleged offensive publications did not constitute a "clear and present danger," that the evil, if evil there be, was not "substantial," that acts which have an "inherent tendency" or a "reasonable tendency" to influence decisions are within the protection of the constitutional guaranty of free speech, etc. Justice Black was not unmindful of *Patterson v. Colorado,* supra, and in my humble opinion he should have *reaffirmed* or *repudiated* the concise, plainly worded and *understandable* opinion of Justice Holmes in *Patterson v. People;* he did neither (unless by innuendo) but contented himself by attaching to the opinion a note containing the statement:

"*Patterson v. Colorado,* 205 U.S. 454, the only case before this Court during that period in which a state court's power to punish out-of-court publications by contempt was in issue, cannot be taken as a decision squarely on this point. Cf.: 'We leave undecided the question whether there is to be found in the Fourteenth Amendment a prohibition similar to that in the First.' "

In the *Bridges* case, Mr. Justice Frankfurter wrote a dissenting opinion, concurred in by Chief Justice Stone, Justice Roberts and Justice Byrnes. Among other things he stated:

"Our whole history repels the view that it is an exercise of one of the civil liberties secured by the Bill of Rights for a leader of a large following or for a powerful metropolitan newspaper to attempt to overawe a judge in a matter immediately pending before him. The view of the majority deprives California of means for securing to its citizens justice according to law — means which, since the Union was founded, have been the possession, hitherto unchallenged, of all the states. This sudden break with the uninterrupted course of constitutional history has no constitutional warrant. To find justification for such deprivation of the historic powers of the states is to misconceive the idea of freedom of thought and speech as guaranteed by the Constitution.

\* \* \*

"We are not even vouchsafed reference to the specific provision of the Constitution which renders states powerless to insist upon trial by courts rather than trial by newspapers. \* \* \*.

\* \* \*

"The administration of justice by an impartial judiciary has been basic to our conception of freedom ever since Magna Carta. It is the concern not merely of the immediate litigants. Its assurance is everyone's concern, and it is protected by the liberty guaranteed by the Fourteenth Amendment. That is why this Court has outlawed mob domination of a courtroom, *Moore v. Demsey,* 261 U.S. 86, mental coercion of a defendant, *Chambers v. Florida,* 309 U.S. 227, a judicial system which does not provide disinterested judges, *Tumey v. Ohio,* 273 U.S. 510, and discriminatory selection of jurors, *Pierre v. Louisiana,* 306 U.S. 354; *Smith v. Texas,* 311 U.S. 128."

Justice Frankfurter too was aware of *Patterson v. Colorado,* supra, and reaffirmed the law as stated therein:

" \* \* \* But the Constitution does not bar a state from acting on the theory of our system of justice, that the

'conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' *Patterson v. Colorado,* 205 U.S. 454, 462. The theory of our system of justice as thus stated for the Court by Mr. Justice Holmes has never been questioned by any member of the Court. * * *."

In *Pennekamp v. State of Florida,* 328 U.S. 331, the United States Supreme Court, by unanimous decision, reversed a judgment of the Supreme Court of Florida, denying habeas corpus to Pennekamp who was imprisoned for contempt consisting of publication of editorials and a cartoon which it was claimed interfered with the administration of justice. The decision is based on *Bridges v. California,* supra, and adds further illumination as to the character of the danger required to make it contemptuous:

" * * * the danger * * * has not *the clearness and immediacy* necessary to close the door of permissible public comment." (Emphasis supplied.)

In *Craig v. Harney,* 331 U.S. 367 (1947), the Supreme Court reversed a judgment of the Criminal Court of Appeals of the State of Texas, which judgment denied Craig release from the county jail where he was confined for alleged contempt consisting of publishing articles allegedly interfering with the court's administration of justice. The majority, with no reference to *Patterson v. Colorado,* supra, based its decision on *Bridges v. California,* supra. Here again, Justice Frankfurter and Justice Jackson in separate opinions dissented. Justice Frankfurter again made it very clear that in his opinion, *Patterson v. Colorado* is still the law. To quote:

"The difference between the issue before us and that raised by the Toledo and *Craig* cases is basic. In those cases the Court had before it, and Mr. Justice Holmes was concerned only with, the proper application of a federal statute setting a narrowly confined scope to the power to punish for contempt. The Court was not con-

cerned with the Constitutional power of the States to enforce a broader contempt policy. Such a power, in fact, had been assumed to be beyond doubt. 'When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument or intimidation hardly can be denied.' So wrote Mr. Justice Holmes for this Court. *Patterson v. Colorado,* 205 U.S. 454, 463. To be sure, he wrote this forty years ago, and on several occasions thereafter, as part of the formulation of his profound tolerance for freedom of expression, he spoke out against misuse of the power to punish for contempt. But nothing that that great judge ever wrote qualified in the slightest his conviction that the theory of our system of justice is 'that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' *Patterson v. Colorado,* supra, at 462. ·· * * ."

In none of the cases referred to above, nor in numerous other cases which I have read, do I find that the holding in *Patterson v. Colorado* has been expressly overruled. I find no adverse criticism of its holding by the Supreme Court of the United States or any member thereof, or by any other court. On the other hand, I find it relied upon as an authority, quoted from and referred to with approval, by justices of the United States Supreme Court, judges of the United States Circuit and District Courts, and justices of Supreme Courts of numerous states. I am persuaded that *Patterson v. Colorado* is the law, supported by logic and reason, by which we must weigh Jameson's conduct, and in so doing I conclude that he is guilty of contempt. That by his conduct he has, without right or authority, injected into litigation pending before this court matters calculated to influence the court and produce a result that is con-

trary to and foreign to our judicial system. For this he should be punished.

Jameson could have had his say in the case; in fact he did, for as a citizen of the state of Colorado, he was a party. If he thought his interests were inadequately represented, he could have asked the court to have counsel appear before the court as amicus curiae to give expression to his views, all, however, in an orderly way. If he was critical of the court, its individual members, or its decision, he could have awaited the final outcome and then with impunity given vent to his feelings and expression to his views. Such course, however, did not meet with Mr. Jameson's wishes. Clearly, Mr. Jameson could not appear before the court in person while the matter was pending determination and state verbally to the court the matter printed, nor could he employ counsel to do so, since clearly any attorney at law undertaking to so address the court would be in contempt and subject to disciplinary action. To further his purpose of influencing the court, he had to act before the decision became final, while the minds of the court were still open and subject to change. With knowledge that he had no right to present directly to the court the accusations of corrupt motives contained in his editorial, he undertook to indoctrinate the court and influence its decision by bombarding the court from afar, under what he erroneously thought was the protective covering of the Constitution.

In seeking to accomplish his purpose, Mr. Jameson, by his actions, evidenced a calloused indifference to human sensibilities and the good names of the individuals making up the court; a calloused indifference as to what effect his words and the publication thereof might have on the stature of the court and its ability to perform its functions and enjoy the confidence of the public in the future, as in the past. As the aftermath of his actions, Mr. Jameson may bask in satisfaction over a job well

done, or he may suffer the remorse that often follows ill-advised and unwarranted action.

On March 26, 1959, in the performance of its duties, the court considered and ruled upon a petition for rehearing filed by Arapahoe County. The petition and matters therein presented were presented in an orderly and scholarly manner by licensed lawyers to whom the litigants had entrusted their claims. No doubt said petition was tendered for the purpose of helping the court to arrive at a legal and just conclusion, and was so regarded by the court. At the same time I had before me, or in my mind at least, fragments of Jameson's contentions and innuendoes seeking a decision that would square with Jameson's desires. To make a decision under such circumstances and in such an atmosphere was a new and unhappy experience for me, and foreign to the administration of justice, as I have known it, by constitutional courts to whom is delegated the duty of deciding cases presented in orderly and time-honored manner.

I have been and remain wholly intolerant of any *outside* influence sought to be visited upon *any* court during the pendency of *any* case.

MR. CHIEF JUSTICE KNAUSS joins in this dissenting opinion.