109 N.J. Super. 548 (1970)
264 A.2d 95
IN THE MATTER OF LOOK MAGAZINE, CHRISTOPHER S. WREN AND MARGARET ENGLISH.
Superior Court of New Jersey, Law Division.
Decided March 25, 1970.
*549 Mr. John G. Thevos, Prosecutor.
CRANE, A.J.S.C.
The Prosecutor of Passaic County has petitioned the court to issue an order to show cause why Look Magazine, Christopher S. Wren and Margaret English, authors of an article entitled "Murder New Jersey Style" which appeared in the March 10, 1970 issue of the magazine, should not be held in contempt of court. Such an application should receive careful scrutiny in view of the drastic nature of the relief sought. Initially, a preliminary determination must be made as to whether probable cause exists to support the issuance of the order to show cause. Van Sweringen v. Van Sweringen, 34 N.J. Super. 394, 402 (App. Div. 1955), rev'd on other grounds 22 N.J. 440 (1956).
The prosecutor contends that the article, containing allegations directly bearing upon the guilt or innocence of defendants, was published during the course of a trial and before the return of the verdict. This, he asserts, tended to interfere with the orderly process of the trial and the due administration of justice. He also contends that the article has "infected and poisoned the atmosphere of every county in this state" with respect to the trial of other indictments against the defendants not yet tried.
From the exhibits presented and from the records of the court, of which we take judicial notice, the following facts appear. After the death of two persons in Passaic County in 1966, murder indictments were returned. In one case (Indictment 279-67) Paul Kavanaugh, Vincent Kearney, Jr., Harold Matzner and Dorothe Krueger were charged with the murder of one Judith Kavanaugh, the wife of defendant Kavanaugh. In the other case (Indictment 64-67) Vincent Kearney, Jr., Harold Matzner and John C. De Groot, a Clifton police sergeant, were charged with the murder of one Gabriel De Franco. The cases attracted a *550 great deal of attention in the local press, necessitating the drawing of trial juries from other counties. During the preliminary stages the trial judge issued orders directed to counsel and the parties which in essence forbade the dissemination of information concerning the cases to the public press and other news media. The conduct of one attorney with relation to matters appearing in the press resulted in the revocation of permission for him to appear pro hac vice. State v. Kavanaugh, 52 N.J. 7 (1968). The trial of State v. Kearney et al. (Indictment 64-67), relating to the De Franco homicide, was completed in February 1969, resulting in a verdict of acquittal. The trial of State v. Kearney et al. (Indictment 279-67) was begun in October 1969. It was concluded on February 22, 1970 by a verdict of acquittal.
The article itself is hardly objective. It may more accurately be described as a one-sided version of the investigation of the homicides and the trial of the cases, exhibiting a strong bias in favor of defendants' point of view. Its dominant theme is stated in the subtitle: "How gambling, incompetence and corruption led to the trials of five people for murders they didn't commit." It is replete with statements which might be regarded as libelous such as:
The Prosecutor's Office had no case. But to drop charges against Matzner and his co-defendants would have been to invite a massive false-arrest suit. It would also have brought about inquiries into the Passaic County Prosecutor's office, and Mafia involvement in De Franco's murder.
Before Dowd could testify for the defense months later, he was approached quietly and told he would get two bullets in his head if he talked too much.
Edward Lenney, now out on parole, speaks bitterly of the Prosecutor's Office: "they fed me information that I believed, and they had to know it wasn't true."
If the state's assault was launched in error, it was pressed maliciously. The Prosecutor's Office wanted public credit for the spectacular solution of two nagging, unsolved murders. It could not, by backing down, risk a false arrest suit and an inquiry into its own conduct. Faced with admitting incompetence or pressing a trumped-up case, Passaic County chose the latter.
*551 Obvious journalistic tricks are used to persuade the reader to the intended conclusion. The principal investigator for the prosecutor is described as "a fat, asthmatic county investigator" who "owed his job to political influence," while an investigator for the defense is described as "a top private investigator." One side of a double-page spread shows four of the prosecution witnesses in characteristically unflattering police identification photographs, while defendants in sharp contrast are attractively portrayed on the other side. The total effect is one of sensational muckraking journalism in classic form.
The prosecutor has submitted a point-by-point analysis purporting to refute the statements contained in the article. It is not necessary, however, to decide the truth or falsity of the contents of the article to resolve the issue of whether an order to show cause should be issued. Whether the article is libelous is also totally irrelevant to the inquiry here. In re Bozorth, 38 N.J. Super. 184 (Ch. Div. 1955). Persons claiming to have been libeled by this article may, of course, pursue civil remedies if they wish. Whether criminal libel has been committed need not be explored in this proceeding.
From evidence offered in connection with this petition it appears that the March 10 issue of Look Magazine was shipped from Philadelphia to distributors in Passaic County on February 17, 1970. Delivery was made in Passaic County on February 18, 1970. It further appears from affidavits presented that the magazine appeared on the newsstands in Passaic County on February 23, 1970.
Having been aware of the expected publication of the article, the trial judge ordered the jury sequestered on the evening of February 18. So far as is known, no juror saw the offending article. The summations of counsel began on the 19th and were completed on the 21st. The court charged the jury on the 21st and ultimately the verdict was returned on the 22nd. Thus, in actual fact the publication *552 of the article did not have an influence upon the outcome of the case.
The matter of the relationship between the courts and the press is a delicate one. In deference to the provisions of the United States and New Jersey Constitutions relating to freedom of the press (U.S. Const., 1st Amdt.; N.J. Const. (1947), Art. I, par. 6) our courts have shown understandable restraint in dealing with the press.
A variety of reported opinions have dealt with the problems of preserving the right of litigants to a fair trial while recognizing the right of the press to report the news and express opinions freely. Most of these have involved situations in which excessive publicity before and during the trial prejudiced a defendant's right to a fair trial. See, e.g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); State v. Van Duyne, 43 N.J. 369 (1964). Few have faced the problem of whether a court may take direct action against the press. In Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941), the publishers of a newspaper had been held in contempt of court for comments pertaining to pending litigation. Reversing the contempt convictions, the Supreme Court held that a finding that the published material had an "inherent tendency" to interfere with the orderly administration of justice was an insufficient basis for a contempt conviction. The "clear and present danger" test announced in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919), was reiterated with emphasis on the idea that "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances may be punished." 314 U.S., at 263, 62 S.Ct., at 194. Again in Craig v. Harney, 331 U.S. 367, 373, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947), it was said that "freedom of speech and of the press should not be impaired through exercise of that power [contempt] unless there is no doubt that the utterances in question are *553 a serious and imminent threat to the administration of justice." The same test was applied in the case of In re Bozorth, supra, where defendant had caused to be published a statement critical of a judge's decision. Since the case had been concluded, it was held that the author of the statement was not subject to punishment for contempt even though the utterance may have been libelous.
In recent years the subject has been studied by a committee of the American Bar Association. These studies have culminated in the promulgation of "Standards Relating to Fair Trial and Free Press," adopted February 19, 1968. The approach favored by the Standards is to place restraints upon lawyers, law enforcement officers, judges, witnesses and others to prevent the release of information or opinion to the press which would tend to interfere with the trial of a case or prejudice the administration of justice. The Standards recommend (§ 4.1) that the contempt power be used cautiously, but that it should be exercised where
* * * a person who, knowing that a criminal trial is in progress * * * disseminates by any means of public communication an extra-judicial statement relating to the defendant or to the issues in the case that goes beyond the public record of the court in the case, that is wilfully designed by that person to affect the outcome of the trial, and [emphasis supplied] that seriously threatens to have such an effect.
If the Look article had been published earlier, it might have been relevant to inquire whether it was "wilfully designed * * * to affect the outcome of the trial" and whether there was a serious threat to the outcome of the trial. In view of the fortuitous fact that the jurors had been sequestered and had begun deliberations before the publication could have reached them, the ingredient of imminence deemed to be of such importance in the judicial decisions cited above and which seems to be implicit in the Standards has been removed. So, too, has the necessity *554 for an inquiry into the state of mind of the authors and publishers of the article.
With respect to the indictments against the defendants which have not yet been tried, the prosecutor has requested a "cooling off" period. They have not yet been scheduled for trial. We do not know what effect, if any, the article has had on the minds of prospective jurors. A searching examination of prospective jurors on voir dire may perhaps be revealing. In any event, we are not persuaded that the publication of the article presents a serious or imminent threat to the ability of the State to obtain a fair trial of the issues in those remaining indictments.
Here more than substantial doubt exists as to the ultimate relief sought. Procedurally the situation is analogous to that existing where an application for a preliminary injunction is presented. In such cases a preliminary injunction will not issue if the plaintiff's rights are not clear as a matter of law. Accident Index Bureau Inc. v. Male, 95 N.J. Super. 39, 50 (App. Div. 1967); General Electric Co. v. Gem Vacuum Stores, 36 N.J. Super. 234, 236 (App. Div. 1955). For the reasons expressed above, the court is unconvinced that probable cause exists for the issuance of the order to show cause.
The petition is denied.