96 P.2d 1

### STATE v. McALLISTER.

No. 4477.

Supreme Court of New Mexico.

Nov. 6, 1939.

O. O. Askren, of Roswell, and Caswell S. Neal, of Carlsbad, for appellant.

Filo M. Sedillo, Atty. Gen., and George Lougee, Asst. Atty. Gen., for the State.

SADLER, Justice.

The respondent, McAllister, was convicted of contempt and appeals. The information upon which he was tried accused him

of personally contacting a juror named Ledbetter, knowing that the said Ledbetter had been selected to sit as a juror in the trial of a certain case, and of attempting to talk with him regarding the facts of said case "with the willful intent and design of obstructing the due administration of justice". One Spillers was jointly accused with respondent of the same offense but was acquitted.

At the time of the events hereinafter related the respondent, McAllister, Ledbetter and Spillers all were residents of Eunice in Lea County, New Mexico. McAllister owned and operated a bar. Spillers was employed by him. Ledbetter was manager of Eunice Gas Company. They were all friends. On January 11, 1939, a session of the District Court of Lea County was being held at Lovington, the county seat. Ledbetter was on the regular jury panel. The case of State v. Bouldin upon a charge of involuntary manslaughter stood for trial.

On the date mentioned Ledbetter and Spillers met in the corridor of the county court house. Ledbetter, explaining the occasion of his presence in Lovington, stated to Spillers that he was "on the regular jury panel". Spillers replied that he was a witness in the Bouldin case and pointing him out to Ledbetter said: "There's a mighty fine fellow". Ledbetter then turned and walked away.

Later on the same day Ledbetter was accepted and qualified as one of the jurors to try Bouldin. About five o'clock P. M. court recessed, and the jury was excused until the next day, Ledbetter returning to Eunice. He made his home in the building which Eunice Gas Company occupied as its office and was its local manager. About eight o'clock that evening he had a telephone call from Spillers concerning which he testified: "A. He called on the phone, said, 'This is Raymond.' He said, 'Red wants to talk to you' (meaning Red McAllister) 'Wants to talk with you.' I asked him what he wanted with me. Raymond said, 'I don't know what he wants with you.' I explained to him then that I had been selected on this jury for this trial the next day and I didn't want to talk to anybody in the office that evening. He said, 'All right; that is fine. I will tell him.' That is all the conversation we had over the phone there at eight o'clock."

About thirty minutes later, or approximately 8:30 P. M. McAllister called Ledbetter on the telephone saying he wished to talk with him and requesting him to come to his, McAllister's place of business. He explained there was something wrong with his gas bill and that he wished to talk over the discount on same. Ledbetter replied that he did not wish to come to see him nor talk to anybody, but if McAllister wished to see him he could come to his, Ledbetter's, office. Within a few minutes, McAllister arrived at Ledbetter's office and found him there with a woman clerk who was finishing up a report on which she had been working. It required about ten minutes for the clerk to finish the work upon which she was engaged. Ledbetter as a witness, taking up at this point, testified:

"Q. During that time, did he say anything about the gas bill? A. No, sir.

"Q. Was it mentioned? A. No, sir.

"Q. Then what happened? A. Then after Mrs. Parker went away, Mr. McAllister asked me if I wanted to talk about this case.

"Q. What was his statement about it? A. That's exactly it. He said, 'Doc, do you want to talk about this case?' or words to that very effect. I explained to him, no, I didn't want to talk about it, didn't want to say anything about it at all. He didn't insist, after I said I didn't care to talk about it. That was a closed book right then and there. He said, 'All right, there is no hard feelings?' I said, 'No, we will drop it where it is.' That was all that was said about the thing then. Then after he finished talking about it, I had sent a notice out the day before on his gas bill. I asked him if he paid his gas bill and he said he didn't, hadn't paid it, but he would. He had some obligations, some money he was trying to collect in, he said he would get it tomorrow, I believe he told me. I said, 'That is all right. We allow a little discount on certain bills if they are paid by a certain date.' His bill was a large bill. I explained to him I would be glad to allow him that discount, because he had had trouble collecting his money, if he would pay it the next day or whatever it was. That was the extent of our conversation. He went on his way."

Further interrogated by the court and his own counsel, after both sides had rested, the witness, Ledbetter, testified:

"By the Court:

"Q. I believe you testified, Mr. Ledbetter, he stayed there ten minutes while this lady was working? A. She was counting money, making a report.

"Q. What were you doing? A. Standing behind her in the office waiting until she finished to go home. She was finishing up a report, I was showing her how to make it. When she finished up, he asked me then.

"Q. He asked you then if you wanted to talk about the case. A. Yes, sir.

"By Mr. Askren:

"Q. You were busy, were you not, wound up in your affairs with the bookkeeper? A. She was doing the work. I was only waiting.

"Q. You were available for conversation as soon as he came? A. We were not talking at all, any business. She was carrying on her business, I was in the office. I was behind the counter, he was out in front, standing out in front.

"By the Court:

"Q. He didn't attempt to bring up any conversation until the lady left? A. He didn't attempt to talk with me about anything at all."

At the conclusion of the evidence, the trial court, in finding the respondent, McAllister, guilty, made the following observations: "By the Court. I think I am going to find from the evidence in this case, beyond a reasonable doubt, that the defendant, G. T. ("Red") McAllister contacted the

juror, Ledbetter, after he had been sworn in the case of State v. Bouldin, as charged in the information, with the intent to talk to him about the case, with the intent to obstruct the administration of justice, and he is guilty of contempt."

Since the respondent, Spillers, was discharged, we have before us for review only the appeal of McAllister. The sole question presented is the sufficiency of this evidence, set out at some length above, to support the conviction.

We entertain no doubt that the facts in evidence afford adequate support for the conviction. 13 C.J. 22, § 27, under "Contempt"; State ex rel. Webb v. District Court, 37 Mont. 191, 95 P. 593, 15 Ann.Cas. 743 with case note at page 747; Emery v. State, 78 Neb. 547, 111 N.W. 374, 9 L.R.A., N.S., 1124; McCauley v. State, 124 Neb. 102, 245 N.W. 269; Coleman v. State, 121 Tenn. 1, 113 S.W. 1045; Ex parte Privitt, 127 Tex.Cr.R. 475, 77 S.W.2d 663; Richardson v. State, 43 Ga.App. 229, 158 S.E. 369; Gridley v. United States, 6 Cir., 44 F. 2d 716, 744; Annotation, 63 A.L.R. 1269.

In 13 C.J. 22, the author of the text upon the subject, "Contempt", notes a zealous and altogether essential solicitude on the part of the courts to prevent jury tampering. The author states: "All willful attempts of whatever nature, seeking to improperly influence jurors in the impartial discharge of their duties, is contempt, whether it be by conversations or discussions, or by attempts to bribe. The rule applies, although the juror has not been sworn to try the case with reference to which it was sought to influence him, or although actually serving could be legally disqualified; but of course it does not apply where a case has been ended by the discharge of the jury and the rendition of judgment."

As pointed out in Emery v. State, supra, it is unessential to proof of the offense that the attempt to influence the juror should have succeeded. It is also stated in this case [78 Neb. 547, 111 N.W. 375, 9 L.R.A.,N.S., 1124]: "It appears from the allegations of the information that the accused desired to talk with the juror about the case upon which he was then serving. This conduct in itself was highly improper, and constituted contempt".

We approve the comment of the Court of Criminal Appeals of Texas in Ex parte Privitt, supra. The court said [127 Tex.Cr. R. 475, 77 S.W.2d 664]: "It is hard enough in any case to secure jurors who have not read of the case, or from some other source formed an opinion, and it would be indeed a sorry day if litigants, civil or criminal, might surreptitiously secure in advance lists of jurors summoned for the week of the trial of their cases, and go or send their friends to pour privately into the ears of prospective jurors their own versions of their cases, either to disqualify such jurors, or to corrupt them, thus rendering more difficult the due administration of justice and the proper execution of the law".

For us to hold that the facts here shown do not constitute indirect contempt would be to open wide the door to successful jury tampering. Those so disposed might then in perfect safety make the approach, as was

done here. If rebuffed by the juror, the tamperer could beat a hasty retreat with entire assurance that he was free from prosecution. But if not rebuffed, and the ugly shadow of a corruptly disposed juror began to take form, the vicious end sought would be attained with little danger of exposure. Only by making it dangerous for the jury tamperer to set out upon his sinister journey may the administration of justice have the protection essential to its survival.

Finding no error, the judgment of the trial court will be affirmed.

It is so ordered.

BICKLEY, C. J., and BRICE, ZINN, and MABRY, JJ., concur.