406 P.2d 349

**STATE of New Mexico, Plaintiff-Appellee,**

**v.**

**C. N. (Bill) MORRIS, Defendant,**

**Will Harrison, Respondent-Appellant.**

**No. 7684.**

Supreme Court of New Mexico.

Oct. 4, 1965.

Earl E. Hartley, Atty. Gen., Santa Fe, C. M. Neal, Sp. Asst. Atty. Gen., for appellee.

William C. Marchiondo, David R. Gallagher, Timothy P. Woolston, Arturo G. Ortega, Rolando J. Matteucci, Gene E. Franchini, David W. King, Courtney Vallentine, Irving E. Moore, Joseph L. Smith, Harry E. Stowers, Fred M. Calkins, Jr., Lorenzo A. CHAVEZ, Albuquerque, amici curiæ for appellee.

Gilbert, White & Gilbert, William Booker Kelly, Santa Fe, for appellant.

Seth, Montgomery, Federici & Andrews, Santa Fe, Arthur B. Hanson, Calvin H. Cobb, Jr., Washington, D. C., amici curiæ for American Newspaper Publishers Ass'n.

Seth, Montgomery, Federici & Andrews, Santa Fe, amici curiæ for New Mexico Press Ass'n.

Seth, Montgomery, Federici & Andrews, Santa Fe, Royall, Koegel & Rogers, New York City, amici curiæ for American Soc. of Newspaper Editors.

James D. Sidwell, Paul A. Phillips, William C. Schaab, Albuquerque, amici curiæ for New Mexico Civil Liberties Union.

COMPTON, Justice.

The respondent, Will Harrison, appeals from a judgment finding him guilty of criminal contempt by reason of the publication of certain articles during the pendency of the case, State of New Mexico v. Morris. He was sentenced to serve ten days in the Dona Ana County jail and fined $250.00, the fine being suspended upon payment of $250.00 in court costs.

C. N. (Bill) Morris, an assistant district attorney at Carlsbad, New Mexico, was charged with the crime of involuntary manslaughter in the killing of five people in

Eddy County on June 22, 1963, while driving under the influence of intoxicating liquor. Upon the voluntary recusal of judges of the Fifth Judicial District, the Honorable Paul Tackett, Judge of the Second Judicial District, was designated to hear and try the cause, after which change of venue was granted from Eddy County to Dona Ana County. On November 6, 1963, Morris pleaded guilty to the charge against him. After hearing character witnesses on behalf of Morris, the court entered the following order dated December 5, 1963:

"IT IS CONSIDERED BY THE COURT AND IT IS ORDERED BY THE COURT that sentence be deferred for a period of twelve (12) months and that the Defendant, C. N. (Bill) Morris be placed on probation for said period of time and is required to report to the Probation Officer in Carlsbad, New Mexico once each month, in person, for said 12 month period and at the end of said 12 month period said Probation Officer submit a report to the Court for his consideration.

"IT IS FURTHER ORDERED BY THE COURT that said Defendant, C. N. (Bill) Morris, be assessed a Fine of $500.00 which is suspended at the pleasure of the Court and on the condition of Defendant's good behavior and further that he pay $500.00 court costs."

The appellant has been the author of a column on public affairs widely circulated in the newspapers in New Mexico since 1952. On January 24, 1964, counsel who represented Morris filed an affidavit charging Harrison with contempt of court by reason of six articles appearing in his column between the dates of November 12, 1963 and January 22, 1964, the first of which appeared six days following the plea of guilty by Morris.

The respondent admitted authorship of the articles but denied that any of the statements and publications as charged by the affidavit presented clear and present danger to the administration of justice in New Mexico, or that they constituted contempt of court. He further averred that the columns constituted fair comment or, at the least, just criticism of the acts of that court or of the courts of New Mexico; that all of the statements contained in his columns were true, and that the order to show cause was an attempt to infringe upon his right to make and publish such comments, constituting a violation of his constitutional rights of freedom of speech and of the press.

The six articles forming the basis of the appellant's conviction of criminal contempt follow:

*November 12, 1963:*

"SANTE FE—C. N. (Bill) Morris, the assistant district attorney at Carlsbad who pleaded guilty to manslaughter in the killing of five people while driving intoxicated and was given a suspended fine and a one-year deferment of sentence, will not lose his license to practice law in New Mexico, according to a Sante Fe Authority on disbarment.

"The official who asked that his name not be used referred to state law calling for disbarment of an attorney convicted of a 'felony or misdemeanor involving moral turpitude.'

"The official said that the Morris plea of guilty to the 'unlawful killing of five' while 'driving while intoxicated' probably did not involve 'moral turpitude.'

"DRIVER PERMIT IS SUSPENDED

"Morris, who resigned as assistant district attorney shortly after the June accident in which an Eddy County farm worker, Gregorio Molina, his wife and three children were killed and five other children injured, has lost his driver license for the time being, and presumably certain civil rights that are denied persons convicted of a felony.

"His surprise plea of guilty before Judge Paul Tackett of Albuquerque knocked out an elaborate prosecution case that had been worked up by state police and investigators for the attorney general.

"HAD STATEMENTS ON LIGHTS, SPEED

"The investigators had a statement from Mrs. Jimmie House, a store operator at Atoka in Eddy County, that the Molina car had tail lights operating on the night of the accident.

"A 12-year-old son of the Molinas who survived the accident gave a statement that the Molina's 1953 sedan was traveling at about 50 miles an hour when it was struck from the rear by the Morris car.

"There had been much speculation that the Molina car was operating without tail lights and was moving at a very low speed in the 55-mile-an-hour speed zone where the accident occurred.

"POLICE OFFICER REFERS TO SPEED

"State Police Officer Jim B. Davis who reported the Morris car went over and through the Molina car and traveled 636 feet before coming to a stop, said in a signed statement that 'it had to be going at a very tremendous speed.'

"There was no estimate from officers in the attorney general's file on the MPH speed of the car.

"CARLSBAD GROUP SUPPORTS MORRIS

"Other statements gathered by the attorney general were from officers, motorists, and employees of two Artesia liquor establishments concerning Morris' condition before and after the accident.

"He wasn't hurt in the accident.

"Half a dozen of the most respected people in Carlsbad attested to Morris' usual sobriety and his good reputation before Judge Tackett passed sentence.

"He was fined $500 and fine suspended and was then assessed $500 court costs.

"He was ordered to report monthly to the Carlsbad probation officer and to appear before the court in one year for sentencing.

"MOST ANTICIPATED SOME TIME IN JAIL

"The Tackett order surprised even some who were close to the Morris defense.

"They thought he would get at least token imprisonment to be served, perhaps, in a county jail. The attorney general, the prosecutor in the case, did not recommend clemency.

"MUCH COMMENT ABOUT CASE

"Naturally, the lawyers' handling of a lawyer in trouble—in this case a public prosecuting lawyer—has set off wide spread comment.

"From the tone of two letters I got from Artesia and Carlsbad one would think I was to blame for what the court did. There has been much talk about the case also among legislators gathered here for the special session.

"SIMILAR CASE IN SANTA FE

"The court action in the Eddy County case is particularly interesting in Santa Fe County where three persons were killed early this month when their car was struck from the rear by an allegedly drunk driver.

"The main difference in the cases is that the people killed in the Santa Fe accident were of a prominent family and the driver of the other car was a humble country fellow.

"What the court does with the humble Santa Fe driver who killed the prominent people will go on the record with what the court did with the prominent driver who killed humble people."

*January 2, 1964:*

"WARDENS SUFFER TAP ON WRIST

"Two local game wardens who were employed to arrest and prosecute saps who vilated [sic] hunting rules were caught themselves shooting deer illegal-

ly and were punished with $50 fines and 20-day vacations without pay.

"The two, Carl L. Farnsworth, $345 a month, and R. K. Dunlap, $420, were arrested by their superior, Marion F. Embry of Las Cruces, and both pleaded that they didn't know they were violating the law.

"Farnsworth is a rookie of about a year in the department. Dunlap has been in for about 15 or 20 years, time in which he might have been expected to learn the rules.

"KILLER OF FIVE GETS NOTHING

"The game department in its charitable attitude towards its law enforces might have been guided by the recent action in the court of District Judge Paul Tacke*t* [sic] in which C. N. (Bill) Morris, Carlsbad assistant district attorney who was employed with public money to prosecute and jail law offenders, pleaded guilty to killing five people while drunk driving and got a suspended fine and a deferred sentence.

"The arrest and the guilty pleas*e* [sic] of the two local game wardens were not reported in the manner followed by the game department when private citizens get in such trouble."

*January 12, 1964:*

"SANTA FE—A question asked in this space Nov. 12 has been answered by the Santa Fe district court.

"In November the assistant district district attorney at Carlsbad pleaded guilty to manslaughter in killing five people while drunk driving and got a suspended fine and a deferred sentence.

"This was lawyer C. N. (Bill) Morris who ran into the rear of a car driven by farm lab*a*rer [sic] Gregorio Molina and killed five of the Molina family and orphaned five more.

"The lawyer admitted he was drunk and Judge Paul Tackett, a lawyer, gave him a sentence which amounted to paying the court cost and being put on good behavior for a year.

"SIMILAR CASE IN SANTA FE

"At the time of the Morris trial there was pending in the Santa Fe district court a case against Elirio Trujillo, 20, of Santa Cruz, chargi*n* [sic] him with manslaughter in the killing of three people while drunk driving.

"Like Morris of Carlsbad, he hit the rear of a car killing three members of the prominent W. W. Lamoreaux family of Santa Fe, and like Morris admitted he was drunk.

"THE QUESTION AND ANSWER

"What will they do with the humble Trujillo youth who killed three prominent people after turning loose the prominent lawyer who killed five prominent [humble] people?

"The answer came this week when District Judge Sam Montoya of Santa Fe sentenced Trujillo to one to five years in prison.

"MORE SERIOUS TO KILL A COW

"Trujillo can do his one to five years in six months with good behavior.

"The only thing the two cases seem to prove is that mass killing by drunk drivers is not a very serious offense in New Mexico, with killing prominent people being slightly more serious than killing humble ones. Kill a cow, drunk or sober, and see what you get."

*January 13, 1964:*

"HIGH COURT ASKS FOR MORRIS RECORD

"The state supreme court has called for a transcript of the trial of C. N. (Bill) Morris, assistant district attorney at Carlsbad who pleaded guilty to killing five members of a farm worker's family while drunk driving and was given a suspended fine and deferment of sentence by District Judge Paul Tackett of Albuquerque.

"The court also asked for all material gathered by the attorney general in preparation for prosecuting the case.

"COURT CONSIDERS JERKING LICENSE

"The court apparently is looking into the possibility of disbarring the lawyer who resigned as assistant district attorney immediately after the accident.

"Some Santa Fe lawyers have been telling that Morris may keep his lawyer license because his offense did not involve 'moral turpitude' as cited in the law. But that doesn't seem to be the unamimous [sic] opinion of the justices.

"OTHERS RECEIVED TIME IN PRISON

"A few days ago Elirio Trujillo of Santa Cruz, who killed three while drunk driving in a rear end collision almost exactly like that in which Morris was involved, pleaded guilty and was given one to five years in prison by District Judge Sam Montoya.

"A few years back J. R. Roden, a Clovis druggist, got drunk and drove his car into a residence killing two people in bed and got a year in prison.

"AG'S OFFICE IS CRITICIZED

"The Morris case is still sticky more than two months after the trial.

"The attorney general, who was designated to prosecute the case, and Asst. Atty. Gen. E. E. (Chano) Chavez have been under criticism for the court's soft treatment of the public prosecutor. They, it should be explained, had nothing to do with the case after the lawyer pleaded guilty.

"DISTRICT ATTORNEY WAS NOT CALLED

"There has also been a round of comment about witnesses who were called by the prosecution before it was known that the lawyer would plead guilty.

"Dist. Atty. Pat Hanagan, Morris' boss, Asst. Dist. Attys. Joe Walton of Lovington, and Jack Love of Lovington, rode with Morris from Santa Fe to Roswell on the day of the accident but only Love was called to testify if there was any drinking going on, and that only at the last hour when an official practically demanded that there be testimony regarding the trip from Santa Fe to Roswell."

*January 16, 1964:*

"BAR COMMITTEE PROBES MORRIS

"The capitol has heard that the secretly operating ethics and grievance committee of the state bar association has ordered C. N. (Bill) Morris, former assistant district attorney at Carlsbad, to show cause why his license to practice law should not be revoked.

"Morris pleaded guilty to killing five members of a farm worker's family while drunk driving near Artesia last summer.

"He was given a suspended fine and deferment of sentence by Dist. Judge Paul Tackett of Albuquerque.

"SUPREME COURT ALSO LOOKING

"Earlier, the supreme court, which rules on the disbarment of lawyers, had requested a transcript of the Morris trial and a record of evidence prepared for the trial by the attorney general and state police.

"If the bar should recommend disbarment the case would be heard by the supreme court.

"Morris resigned as assistant district attorney but has continued in law practice since pleading to the charge last November.

"MORAL TURPITUDE CITED IN LAW

"The law, 18–1–17 of the state statutes, says 'an attorney may be disbarred or suspended by the supreme court * * * his conviction of felony or misdemeanor involving moral turpitude.'

"One Santa Fe authority on the law said shortly after Morris' conviction that the particular charge against him did not involve 'moral turpitude,' whatever that is, and that his license to practice law would not be disturbed. That theory seems to have fallen into doubt and the lawyer's right to practice is now under investigation in two quarters.

"PEN A BAD PLACE FOR PROSECUTOR

"Several prominent Carsbad [sic] people testified that Morris was of good character before Judge Tackett pronounced sentence.

"At one point in the pre-sentence hearing it was said that a grave injustice might be done in sending the prosecuting attorney to the state penitentiary where he would be among criminals that he had sent to prison."

*January 22, 1964:*

"SEVEN MONTHS LATE ON MORRIS LICENSE

"SANTE FE—State Police records show that the driver's license of C. N. (Bill) Morris, former assistant district attorney at Carlsbad, was suspended last June 24 after he had killed five members of a farm laborer's family while drunk driving, but the lawyer's license wasn't actually picked up until the seventh of this month.

"Clyde Anderson, traffic safety officer at Roswell, reported on January 7, to his Santa Fe headquarters that he had been told by Carlsbad Police that Morris had been observed operating an automobile and on the same. day he had State Police pick up the Morris driving permit.

"THOUGHT LAWYER HAD THE PERMIT

"Traffic Safety Administrator D. K. Kelly said that he understood the Morris license was being held by his attorney and that it was picked up as soon as it was learned that Morris had the permit.

"Morris who received a suspended fine and deferment of sentence from District Judge Paul Tackett on his plea of guilty is due to get his license back in June upon passing the usual driver test.

"The Supreme Court and the Ethics and Grievance Committee of the State Bar Association have started looking into the propriety of Morris retaining his state license to practice law some two months after he pleaded guilty in Tackett's court.

"LAWYER CRITICAL OF CASE HANDLING

"There has been widespread comment about the no fine, no jail judgment of the court in handling the fellow lawyer.

"Among the most critical are lawyers themselves who fear that the profession is being made to appear as a favored group in court."

The appellant testified substantially that over the period of time covered between the first and last article in question he devoted only 5.7% of his column to the Morris case, and that he wrote on the basis of continuing developments of public interest in that case. He further stated that he felt that the conduct of public officials who have violated the law, and their consequent treatment before public tribunals, is a subject of wide public interest. At the conclusion of the trial the court found the respondent guilty of contempt. Judgment was entered accordingly, the pertinent portions of which read:

"That the press releases by the respondent occurred during the pendency of the Bill Morris case, and that the defendant in that case will not be sentenced and the case concluded until the month of November, 1954, or thereafter.

"The Court finds the respondent, Will Harrison, guilty of criminal contempt of the court by the publication of articles appearing in the Affidavit."

The appellant claims that his constitutionally protected rights of free speech and press have been violated, that the trial court erred in determining that the Morris case was pending at the time his articles were published and that it erred in considering evidence of contempt not contained in the affidavit. The appellee, on the other hand, asserts that the evidence establishes beyond a reasonable doubt that the publications in question constituted a clear and present danger to the administration of justice in the pending case of State v. Morris and, therefore, the conviction should stand.

It is readily apparent from the record and the able briefs of counsel and of amici curiae that the crucial issue presented, which should be squarely met, is whether, as a matter of law, the articles set forth, under the circumstances of their publication, presented a clear and present danger to the fair and orderly administration of justice in a pending case. In resolving this issue we will assume, for the sake of argument only, and contrary to the second point raised by the appellant, that State v. Morris was a pending case at the time of the publication of the articles. Consideration of that point, as well as a third point raised, will depend upon our disposition of what we have concluded to be the real and important issue.

▆▆ In criminal contempt cases involving out-of-court statements and publications, where it is charged that the fundamental right of freedom of speech and of the press secured by the First Amendment to the Constitution has been violated, the ever-present question is, where does the

right of free speech or of the press end and the right to punish for contempt begin? Recognizing that these contempt charges must be viewed in the light of basic constitutional guaranties for the purpose of fully protecting the equally fundamental rights of freedom of speech and of the press, and the power of the courts to protect the interests of litigants before them in pending judicial proceedings, we think the Supreme Court of the United States has laid down certain controlling principles of law to be applied to the instant case.

■ In view of the exhaustive consideration and treatement given by the Supreme Court of the United States to the various issues presented in this class of cases, including the history of the contempt power of the courts, state and federal, the fundamental rights guaranteed by the First Amendment of the Constitution and made applicable to the states by the Fourteenth Amendment, and the importance of striking a balan^e compatible with upholding equally basic rights without one infringing upon the other, it would only be repetitious for us to attempt here to restate in our own words the underlying reasoning embodied in the decisions of the Supreme Court of the United States. Suffice it to say that the courts of New Mexico are limited by the United States Supreme Court's interpretation of the extent of protection afforded by the First Amendment. Bridges v. State of

California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192; Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546.

In Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470, Mr. Justice Holmes, speaking of constitutional guaranties of the First Amendment, stated that the character of every act depends upon the circumstances in which it is done. He continued:

"* * * The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. * * *"

Subsequently, in Bridges v. State of California, supra, where the substantive evil sought to be averted by contempt proceedings was the direct interference with or the influencing of the orderly and impartial administration of justice, again the "clear and present danger" test was applied. The court held that under the circumstances of each case the substantive evil must be "extremely serious and the degree of imminence extremely high before utterances can be punished." This decision followed Nye v. United States, 313 U.S. 33, 61 S.Ct.

810, 85 L.Ed. 1172, which overruled Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186, where it had been held that the constitutional freedom of the press will not protect a publisher of newspaper articles concerning a pending case where the articles merely "tend to obstruct" the administration of justice.

The "clear and present danger" test was reapplied and reaffirmed in Pennekamp v. State of Florida, supra, and Craig v. Harney, supra. In the Harney case, the court emphasized that the danger sought to be guarded against "must not be remote or even probable; it must immediately imperil." In addition, it was held in the above cases that absent a clear and present danger even the possibility of engendering disrespect for the judiciary as the result of published criticisms of a judge, or of his inclinations and actions, is not such a substantive evil as will justify impairment of the constitutional right of freedom of speech and press.

For other cases in which the principles of "clear and present danger" or "serious and imminent peril" have been discussed at some length, or applied, or both, see New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569; Smotherman v. United States, U.S.C.A., 10th Cir., 186 F.2d 676; Baltimore Radio Show v. State, 193 Md. 300, 67 A.2d 497; In Re Jameson, 139 Colo. 171, 340 P.2d 423; McGill v. State, 209 Ga. 500, 74 S.E.2d 78; Crudup v. State, 106 Ga.App. 833, 129 S.E. 2d 183; Weston v. Commonwealth, 195 Va. 175, 77 S.E.2d 405; People v. Hathaway, 27 Ill.2d 615, 190 N.E.2d 332; Turkington v. Municipal Court, 85 Cal.App.2d 631, 193 P. 2d 795. Compare Evers v. State, 241 Miss. 560, 131 So.2d 653. See also Vol. 44, No. 3, Nebraska Law Review, pp. 622 et seq.; Vol. 28, Columbia Law Review, pp. 401, 525; and Goldfarb, The Contempt Power (1963), pp. 187 et seq.

Except as hereinafter noted in the cited cases from this jurisdiction involving charges of contempt by publications, we perceive no inconsistencies in the underlying principle involved. As early as 1895 it was recognized in In re Hughes, 8 N.M. 225, 43 P. 692, that parties to a pending case have a constitutional right to have their causes tried fairly in court, by an impartial tribunal, uninfluenced by newspaper dictation or popular clamor. State v. New Mexican Printing Co., 25 N.M. 102, 177 P. 751, held that it is the party litigant in a pending case, and not the individual court, that is to be protected and said:

"* * * It is not the personal dignity, nor the personal feelings, of the court that call into operation this arbitrary power. Attacks upon the character and conduct of a judge as an individual may be so persistent and so out-

rageous as to amount to a contempt, but is only when the attack upon the judge as an individual will tend to influence, intimidate, or embarrass him to such an extent as to obstruct the due administration of justice. Undue praise, or fulsome flattery may have the same effect, and under some circumstances might amount to contempt, the same as unwarranted criticism. * * *"

See also State v. Kayser, 25 N.M. 245, 181 P. 278; State v. Magee Pub. Co., 29 N.M. 455, 224 P. 1028, 38 A.L.R. 142; and State v. McAllister, 43 N.M. 514, 96 P.2d 1.

■ However, insofar as the use of the contempt power in this jurisdiction has been based upon comments that merely "tend to" interfere with or "tend to" obstruct the administration of justice in a pending case, without a determination of whether the claimed inherent tendency to obstruct amounted to a clear and present danger or imminent peril that the evil result may be accomplished, those cases can no longer serve as precedents in view of the principles laid down by the Supreme Court of the United States since Bridges v. State of California, supra.

■ Applying the foregoing principles, we conclude that the appellee has failed to sustain its burden of proving beyond a rea-

sonable doubt that there was a clear and present danger, or imminent peril, to the administration of justice in the case of State v. Morris. The articles here were concerned with action already taken by the court in deferring the sentencing of Morris for one year and suspending his fine upon the condition of his good behavior and the payment of an equal amount in court costs. The only substantive evil upon which the contempt charges possibly could be based, or seek to avert, would be the direct interference with or influence on the court of the articles when, at the expiration of the deferment period, Morris would again appear for sentencing or other disposition of the charge against him. We find no reference to, or speculation regarding future action by the court was made in the articles. We find no proof of a clear and present danger or imminent peril of that substantive evil. Nor is there anything in the record to indicate that the trial court so concluded. As stated in Pennekamp v. State of Florida, supra, " * * * the danger under this record to fair judicial administration has not the clearness and immediacy necessary to close the door of permissible public comment. * * *" The articles here for the most part were criticism of the actions of the trial court, and naturally were distasteful to him in the furtherance of justice; nevertheless, we think what was said in Smotherman v. United States, supra, is equally appropriate here:

**488**

"* * * While the remarks were, of course, vexatious and irritating, to say that they had the effect of intimidating, coercing or influencing the judge from his course of duty is to fail to accord him that strength of character and judicial fortitude common to the judiciary and so vividly examplified by the long record of his judicial acts. * * *"

It is not amiss to say here that there is a limit beyond which the press may not successfully assert constitutional immunity. In the exercise of good taste and sound judgment in order to avoid what is termed "trial by newspaper," which may well lead to a miscarriage of justice, no less stamina and fairness is expected of the press in preserving its fundamental rights than of a judge in preserving the fundamental rights of litigants in a pending case. The lowering of standards by the press to just within the limits of constitutional immunity is fraught with danger and should be zealously avoided.

The conclusion reached obviates our determination of the other points raised for a reversal. The cause is remanded to the trial court with directions to set aside the judgment, and it is so ordered.

CARMODY, C. J., and CHAVEZ, NOBLE, and MOISE, JJ., concur.